John P. Margiotta (*jmargiotta@fzlz.com*)
Laura Popp-Rosenberg (*lpopp-rosenberg@fzlz.com*)
Daniel M. Nuzzaci (*dnuzzaci@fzlz.com*)
FROSS ZELNICK LEHRMAN & ZISSU, P.C.
151 West 42nd Street, 17th Floor
New York, New York 10036
Phone: (212) 813-5900

*Counsel for Defendants*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SOLID 21, INC., <br><br>                  Plaintiff, <br><br>       -against- <br><br> RICHEMONT NORTH AMERICA, INC., <br> RICHEMONT INTERNATIONAL S.A., and <br> MONTBLANC-SIMPLO GMBH, <br><br>                  Defendants. | Case No. 1:19-cv-1262 (LGS) |

**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... ii

PRELIMINARY STATEMENT .................................................................................................. 1

STATEMENT OF FACTS .......................................................................................................... 2

    Plaintiff's Prior Suits ............................................................................................................. 2

    Defendants' Activities ........................................................................................................... 3

    Case History .......................................................................................................................... 4

ARGUMENT ............................................................................................................................... 5

I.      Plaintiff's Trademark Infringement and Unfair Competition Claims
       Fail as a Matter of Law ................................................................................................. 6

    A.   "Red Gold" is Not a Valid Mark Entitled to Protection ............................................... 6

         i.    The Term "Red Gold" Is a Generic Name For a Gold Alloy ................................ 7

         ii.   The Fact that "Red Gold" is a Generic Name For a Gold Alloy Renders it
             Generic for Jewelry and Watches Made from that Alloy ..................................... 11

    B.   Defendants' Uses of Red Gold Are Not Likely to Cause Confusion .......................... 13

         i.    Plaintiff's Purported RED GOLD Trademark Is Weak .................................... 13

         ii.   Defendant's Use of "Red Gold" Differs From Plaintiff's
             Purported "Red Gold" Mark .............................................................................. 14

         iii.  The Relevant Consumers Are Sophisticated and Likely
             to Exercise a High Degree of Care .................................................................... 15

         iv.  No Evidence of Actual Confusion ..................................................................... 17

         v.    Defendants Did Not Use the Term "Red Gold" in Bad Faith ........................... 17

         vi.  The Balance of the Polaroid Factors Weighs in Defendants' Favor ................. 18

II.    Plaintiff's Dilution Claims Fail Because RED GOLD Is Not Famous or Distinctive ....... 19

III.   The Court Should Extend its Fair Use Ruling to All of Defendants' Uses ...................... 19

IV.  Defendants Should be Granted Judgment as a Matter of Law on All
       Intracompany Sales ..................................................................................................... 22

CONCLUSION ......................................................................................................................... 23

# TABLE OF AUTHORITIES

## CASES

*Abercrombie & Fitch Co. v. Hunting World, Inc.*,
  537 F.2d 4 (2d Cir. 1976) ...........................................................................................7

*Alzheimer's Disease & Related Disorders Association, Inc. v. Alzheimer's*,
  *Foundation of America, Inc.*, 307 F. Supp. 3d 260 (S.D.N.Y. 2018) ..................................7, 13

*AM General LLC v. Activision Blizzard, Inc.*,
  450 F. Supp. 3d 467 (S.D.N.Y. 2020)...........................................................................6

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986).....................................................................................................5

*Arnold v. ABC, Inc.*,
  06-CV-1747 (GBD), 2007 WL 210330 (S.D.N.Y. Jan. 29, 2007) .........................................21

*Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*,
  973 F.2d 1033 (2d Cir. 1992).......................................................................................16

*Brockmeyer v. Hearst Corp.*,
  248 F. Supp. 2d 281 (S.D.N.Y. 2003)............................................................................6

*Cartier, Inc. v. Four Star Jewelry Creations, Inc.*,
  348 F. Supp. 2d 217 (S.D.N.Y. 2004)............................................................................16

*In re Central Sprinkler Co.*,
  49 U.S.P.Q.2d 1194 (T.T.A.B. 1998) ............................................................................12

*Conopco, Inc. v. Cosmair, Inc.*,
  49 F. Supp. 2d 242 (S.D.N.Y. 1999)..............................................................................16

*In re Cordua Restaurants, Inc.*,
  823 F.3d 594 (Fed. Cir. 2016).......................................................................................12

*Cosmetically Sealed Industries, Inc. v. Chesebrough-Pond's USA Co.*,
  125 F.3d 28 (2d Cir. 1997)............................................................................................21

*De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate, Inc.*,
  440 F. Supp. 2d 249 (S.D.N.Y. 2006)............................................................................16

*Dentsply Sirona, Inc. v. Dental Brands for Less LLC*,
  15-CV-8775 (LGS), 2020 WL 1643891 (S.D.N.Y. Apr. 2, 2020) .....................................5, 19

*Dessert Beauty, Inc. v. Fox*,
  568 F. Supp. 2d 416 (S.D.N.Y. 2008)............................................................................20-21

*Disney Enterprises, Inc. v. Sarelli*,
  322 F. Supp. 3d 413 (S.D.N.Y. 2018)............................................................................6

*EMI Catalogue Partnership v. Hill, Holiday, Connors, Cosmopulos Inc.*,
  228 F.3d 56 (2d Cir. 2000)...........................................................................................20

*Eli Lilly & Co. v. Revlon, Inc.*,
  577 F. Supp. 477 (S.D.N.Y. 1983)................................................................................20

*Federal Trade Commission v. Moses*,
  913 F.3d 297 (2d Cir. 2019)......................................................................................5

*Gayle v. Hoffman*,
  18-CV-3772 (LGS), 2019 WL 9467540 (S.D.N.Y. Mar. 28, 2019)..........................6

*Gross v. Bare Escentuals Beauty, Inc.*,
  641 F. Supp. 2d 175 (S.D.N.Y. 2008)......................................................................16

*Guthrie Healthcare System v. ContextMedia, Inc.*,
  826 F.3d 27 (2d Cir. 2016).......................................................................................7

*Hamilton International Ltd. v. Vortic LLC*,
  486 F. Supp. 3d 657 (S.D.N.Y. 2020)......................................................................6

*In re Helena Rubenstein, Inc.*,
  410 F.2d 438 (C.C.P.A. 1969) .................................................................................12

*Horizon Mills Corp. v. QVC, Inc.*,
  161 F. Supp. 2d 208 (S.D.N.Y. 2001).................................................................7, 12

*Hypnotic Hats, Ltd. v. Wintermantel Enterprises, LLC*,
  335 F. Supp. 3d 566 (S.D.N.Y. 2018)......................................................................15

*La Cibeles, Inc. v. Adipar, Ltd.*,
  99-CV-4129 (AGS), 2000 WL 1253240 (S.D.N.Y. Sept. 1, 2000)..........................18

*Lemme v. National Broadcasting Co.*,
  472 F. Supp. 2d 433 (E.D.N.Y. 2007) .....................................................................12

*Lopez v. Gap, Inc.*,
  883 F. Supp. 2d 400 (S.D.N.Y. 2012)......................................................................14

*Malaco Leaf, AB v. Promotion In Motion, Inc.*,
  287 F. Supp. 2d 355 (S.D.N.Y. 2003)......................................................................19

*Medici Classics Products LLC v. Medici Group LLC*,
  590 F. Supp. 2d 548 (S.D.N.Y. 2008)......................................................................15

*Miller Brewing Co. v. G. Heileman Brewing Co.*,
  561 F.2d 75 (7th Cir. 1977) .....................................................................................12

*Nabisco, Inc. v. Warner-Lambert Co.*,
  220 F.3d 43 (2d Cir. 2000).......................................................................................14

*Naked Cowboy v. CBS*,
  844 F. Supp. 2d 510 (S.D.N.Y. 2012)......................................................................21

*Nick's Garage, Inc. v. Progressive Casualty Insurance Co.*,
  875 F.3d 107 (2d Cir. 2017)......................................................................................5

*Nora Beverages, Inc. v. Perrier Group of America, Inc.*,
269 F.3d 114 (2d Cir. 2001)...................................................................................14

*Plus Products v. Plus Discount Foods, Inc.*,
722 F.2d 999 (2d Cir. 1983)..................................................................................17

*Polaroid Corp. v. Polarad Electronics Corp.*,
287 F.2d 492 (2d Cir. 1961)..................................................................................13

*Roselux Chemical Co. v. Parsons Ammonia Co.*,
299 F.2d 855 (C.C.P.A. 1962)..............................................................................12

*Royal Crown Co. v. Coca-Cola Co.*,
892 F.3d 1358 (Fed. Cir. 2018).........................................................................7, 12

*Saxon Glass Technologies, Inc. v. Apple Inc.*,
393 F. Supp. 3d 270 (W.D.N.Y. 2019).................................................................13

*Saxon Glass Technologies, Inc. v. Apple Inc.*,
824 F. App'x 75 (2d Cir. 2020) ............................................................................13

*Sheetz of Delaware, Inc. v. Doctors Associates Inc.*,
108 U.S.P.Q.2d 1341 (T.T.A.B. 2013) .................................................................12

*SLY Magazine, LLC v. Weider Publications L.L.C.*,
529 F. Supp. 2d 425 (S.D.N.Y. 2007)..................................................................15

*Solid 21, Inc. v. Breitling USA Inc.*,
11-CV-0457 (GAF)(PLAx), 2011 WL 2938209 (C.D. Cal. July 19, 2011)............7

*Solid 21, Inc. v. Breitling USA, Inc.*,
512 F. App'x 685 (9th Cir. 2013) ...........................................................................7

*Solid 21, Inc. v. Hublot of America*,
109 F. Supp. 3d 1313 (C.D. Cal. 2015) ..................................................................7

*Solid 21, Inc. v. Hublot of America*,
685 F. App'x 530 (9th Cir. 2017) ...........................................................................7

*Something Old, Something New, Inc. v. QVC, Inc.*,
98-CV-7450 (SAS), 1999 WL 1125063 (S.D.N.Y. Dec. 8, 1999) .........................19

*Star Industries, Inc. v. Bacardi & Co.*,
412 F.3d 373 (2d Cir. 2005)............................................................................17-18

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*,
588 F.3d 97 (2d Cir. 2009)...................................................................................17

*Stephan Co. v. Elizabeth Arden, Inc.*,
06-CV-3871 (LTS)(FM), 2006 WL 8430160 (S.D.N.Y. Dec. 6, 2006)..................18

*Swatch Group (U.S.) Inc. v. Movado Corp.*,
01-CV-0286 (RLC), 2003 WL 1872656 (S.D.N.Y. Apr. 10, 2003).......................16

*Tiffany & Co. v. Costco Wholesale Corp.*,
971 F.3d 74 (2d Cir. 2020)..................................................................................6

*Tiffany & Co. v. Costco Wholesale Corp.*,
994 F. Supp. 2d 474 (S.D.N.Y. 2014)..................................................................8

*Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*,
221 F. Supp. 2d 410 (S.D.N.Y. 2002)................................................................17

*Virgin Enterprises Ltd. v. Nawab*,
335 F.3d 141 (2d Cir. 2003)..........................................................................13, 14

*W.W.W. Pharmaceutical Co. v. Gillette Co.*,
984 F.2d 567 (2d Cir. 1993)...............................................................................14

*Wonder Labs, Inc. v. Proctor & Gamble Co.*,
728 F. Supp. 1058 (S.D.N.Y. 1990)...................................................................21

## STATUTES

15 U.S.C. § 1064.......................................................................................................11

15 U.S.C. § 1065.......................................................................................................11

15 U.S.C. § 1114....................................................................................................4, 6

15 U.S.C. § 1115.......................................................................................................20

15 U.S.C. § 1125..............................................................................................4, 6, 19

N.Y. Gen. Bus. Law § 349..........................................................................................5

N.Y. Gen. Bus. Law § 360-L.......................................................................................5

## RULE

Fed. R. Civ. P. 56.......................................................................................................5

## TREATISE

J. Thomas McCarthy,
McCarthy on Trademarks and Unfair Competition (5th ed. 2021)........................10, 12

In support of their motion for summary judgment, Defendants Richemont North America, Inc., Richemont International S.A., and Montblanc-Simplo GmbH (collectively, "Defendants") submit this memorandum of law and state the following:

## PRELIMINARY STATEMENT

This case is part of a long-running saga that has plagued the jewelry and watch industry for more than a decade. Due to a mistake by the United States Patent & Trademark Office ("USPTO"), Plaintiff Solid 21, Inc. ("Plaintiff") was allowed to register as a trademark the term "red gold" in connection with gold jewelry and watches. The name "red gold" has been used since antiquity to identify yellow gold that is infused with copper, turning it reddish in color. *Plaintiff's* own expert was quoted in 2010 in a nationally syndicated article stating that "Alloy metal suppliers will vary the copper, but whether you call it red, pink or rose gold, it's all the same process." Red gold is a generic designation, and it has been forever. Indeed, the District Court for the Central District of California has twice found "red gold" generic, although both times the decisions were reversed on procedural grounds.

Plaintiff has abused its purported "red gold" trademark registration by objecting to all uses (including fair uses) of the term "red gold" by jewelry and watch makers, suing not only Defendants but also many of the other biggest names in the jewelry industry. Plaintiff believes that all of these companies conspired to steal its supposed "red gold" designation, but that is simply not true. Rather, these companies all use "red gold" to identify a specific alloy, just as they use the terms yellow gold, white gold, platinum, or silver.

While making a livelihood through litigation, Plaintiff's own business has declined precipitously. The owner, Chris Aire, had a moment of modest commercial success and visibility circa 2005, but his star fell fifteen years ago and his company has now dipped into commercial obscurity. Plaintiff does not own a single brick and mortar store, and its products are not

distributed anywhere other than on Plaintiff's own website and its Amazon storefront. Mr. Aire claims not to track how many "red gold" products Plaintiff sells per year, but by using selling price to revenue averages, one of Defendants' experts concluded that Plaintiff is barely selling 100 products per year, and maybe as few as 44. And while Plaintiff boasts about its celebrity following, any claimed endorsements are quite dated. Plaintiff's own expert admitted that the universe of consumers familiar with Solid 21's "red gold" products is fairly characterized as a "micro universe." Plaintiff's main business nowadays is suing other companies.

Defendants bring this motion for summary judgment to put an end to Plaintiff's anti-competitive, industry-wide litigation campaign. Specifically, Defendants move for judgment on Plaintiff's trademark infringement claims and Defendants' counterclaims on the basis that (i) "red gold" is not a valid and enforceable trademark because it is generic; (ii) even if the mark were valid, Defendants' use of "red gold" is not likely to cause consumer confusion or to dilute the mark; and (iii) Defendants used "red gold" fairly under the Lanham Act to identify the alloy from which their watches and jewelry are made. Defendants also move for dismissal of the claims related to their intracompany sale of products using the term "red gold."

## STATEMENT OF FACTS

### Plaintiff's Prior Suits

As mentioned above, Plaintiff is a small jeweler with very limited distribution and mostly litigates for a living. Plaintiff's founder, Chris Aire, had a minor moment of success in the mid 2000's, but his business has since failed to grow – it is, in fact, shrinking. Plaintiff sells somewhere between 44 and 100 products per year. (Declaration of John P. Margiotta, Esq. in Support of Defendants' Motion for Summary Judgment ("Margiotta Decl.") ¶ 10, Ex. 8.) Mr. Aire's only brick-and-mortar store closed in 2019, and he has not had any third-party distribution

of his products since 2009. (*Id.* at Ex. 5, 186:7-187:15.)

Since 2005, Plaintiff has filed more "red gold" cases than he can remember. (*Id.* at Ex. 5, 42:6-43:19.) A printout of the USPTO's litigation record pertaining to Plaintiff's "red gold" mark shows more than 50 different notices of lawsuits filed by Plaintiff between November 2010 and now. (*Id.* at Ex. 10.) Plaintiff clearly is in the business of litigating and has sued some of the biggest names in watch and jewelry industry for their uses of "red gold," including not only the present Defendants, but also Breitling, Ulysse Nardine, Franck Muller, Chopard, and Movado, to name a few. (*Id.* ¶ 12.)

**Defendants' Activities**

Like the other brands mentioned above, the brands at issue here – MONTBLANC, BAUME & MERCIER and IWC – are reputable, long-standing, luxury watch and jewelry brands. With heritages stretching back more than 100 years, these brands are synonymous with luxury and fine watch making, and Defendants' marketing efforts focus on exploiting the fame and goodwill associated with the respective MONTBLANC, BAUME & MERCIER, and IWC names and marks. (Declaration of Florent Dubiez in Support of Defendants' Motion for Summary Judgment ("Dubiez Decl.") ¶¶ 5-6, 10); Declaration of Sarah Zaouk in Support of Defendants' Motion for Summary Judgment ("Zaouk Decl.") ¶¶ 8-10, 12.) In connection with products of these brands, Defendants have only ever used the term "red gold" truthfully to convey to consumers that a particular watch or jewelry item is made at least in part from red gold, a recognized gold alloy containing a concentration of copper sufficient to give the metal a reddish hue. (Dubiez Decl. ¶ 12; Zaouk Decl. ¶ 15.) Defendants had never heard of Plaintiff or its purported "red gold" mark before adopting and using the term and have used the moniker for

more than a decade without any consumers being confused about the source of Defendants' goods. (Dubiez Decl. ¶ 16; Zaouk Decl. ¶ 21.)

Moreover, as part of maintaining Defendants' luxury branding, they pursue a strategy of limited distribution, selling only through their own websites, at exclusive partner boutiques, self-branded boutiques, and high-end department stores.[1] Plaintiff's products are not available in any of these outlets. (Dubiez Decl. ¶ 17; Zaouk Decl. ¶ 22.) Finally, the vast majority of revenues result from intracompany sales from the European distributors and makers of MONTBLANC, BAUME & MERCIER, and IWC products to its affiliated American company, Defendant Richemont North America, Inc. ("RNA"). (Dubiez Decl. ¶ 20; Zaouk Decl. ¶ 26.) Those intracompany sales could not possibly have given rise to any type of confusion on the part of the affiliated purchaser and should be excluded from the case.

## Case History

This is not the first time these parties have litigated over Plaintiff's alleged "red gold" mark. Plaintiff previously filed a lawsuit against Defendant RNA and another related company in 2011 in the U.S. District Court for the Central District of California. (Margiotta Decl. ¶ 12.) The case was dismissed without prejudice, and the parties entered into a tolling agreement. (*Id.*)

The current lawsuit was filed on February 8, 2019, but the operative complaint – the Third Amended Complaint (ECF No. 67, "TAC") – was filed on September 27, 2019 (the first three complaints having been amended in an attempt to cure various deficiencies). (*See* ECF Nos. 1, 33, 53.) The TAC alleges claims for trademark infringement, unfair competition, contributory trademark infringement, false description, and dilution under Sections 32(1), 43(a), and 43(c) of the Lanham Act, 15 U.S.C. §§ 1114(1), 1125(a), 1125(c), and related claims under New York law,

---

[1] Defendants concede that their products are distributed more widely by "grey" goods dealers who are not authorized to carry them.

namely common law trademark infringement, dilution under N.Y. Gen. Bus. Law § 360-L, and deceptive acts and practices under N.Y. Gen. Bus. Law § 349. (TAC ¶¶ 63-112.)

Defendants moved to dismiss the TAC on October 18, 2019, on various grounds, including that Defendants were immune from liability under the parties' tolling agreement and that Defendants' complained-of uses of the term "red gold" were fair, descriptive uses and not infringing. The Court granted the motion in part in an Opinion and Order dated June 8, 2020 (ECF No. 91, the "Opinion"), finding that certain activities of Defendant RNA were immune under the parties' tolling agreement and also that certain of Defendants' uses of the term "red gold" identified in the TAC constituted "classic fair use" and thus were not infringing. (Opinion at 15.) The case proceeded on an abbreviated set of claims with discovery now complete.

## ARGUMENT

The standards governing motions for summary judgment are well-settled. Summary judgment is appropriate where the record establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 113-14 (2d Cir. 2017) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). To defeat a summary judgment motion, the non-moving party may not rely on conclusory allegations or unsubstantiated speculation, but rather "must establish a genuine issue of fact by citing to particular parts of materials in the record." *Dentsply Sirona, Inc. v. Dental Brands for Less LLC*, 15-CV-8775 (LGS), 2020 WL 1643891, at *1 (S.D.N.Y. Apr. 2, 2020) ("[A] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.") (quoting *F.T.C. v. Moses*, 913 F.3d 297, 305 (2d Cir. 2019));

*see also Gayle v. Hoffman*, 18-CV-3772 (LGS), 2019 WL 9467540, at *1 (S.D.N.Y. Mar. 28, 2019) ("[C]onclusory allegations or denials … are not evidence and cannot by themselves create a genuine issue of material fact where none would otherwise exist.") (citation and internal quotation marks omitted).

Courts routinely grant summary judgment in trademark infringement cases. *See, e.g.*, *AM Gen. LLC v. Activision Blizzard, Inc.*, 450 F. Supp. 3d 467, 485 (S.D.N.Y. 2020) (granting defendants summary judgment on trademark infringement claims because plaintiff was "unable to offer anything more than 'some metaphysical doubt as to the material facts.'"); *see also Disney Enters., Inc. v. Sarelli*, 322 F. Supp. 3d 413, 439 (S.D.N.Y. 2018); *Brockmeyer v. Hearst Corp.*, 248 F. Supp. 2d 281, 300 (S.D.N.Y. 2003). Here, the Court should grant Defendants' motion for summary judgment because there exists no genuine issue of material fact with respect to Defendants' liability on the infringement or dilution claims.

I.      **Plaintiff's Trademark Infringement and Unfair Competition Claims Fail as a Matter of Law**

"Under the Lanham Act, a plaintiff alleging trademark infringement must demonstrate that (1) it has a valid mark that is entitled to protection and that (2) the defendant's actions are likely to cause confusion with [that] mark." *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 84 (2d Cir. 2020) (citation and internal quotation marks omitted); *see also* 15 U.S.C. §§ 1114(1)(a) and 1125(a). Plaintiff bears the burden of proving each of these elements by a preponderance of the evidence. *See Hamilton Int'l Ltd. v. Vortic LLC*, 486 F. Supp. 3d 657, 661 (S.D.N.Y. 2020). Here, the Court should grant summary judgment to Defendants because Plaintiff cannot show ownership of a valid mark or that Defendant's use is likely to confuse.

A.      *"Red Gold" is Not a Valid Mark Entitled to Protection*

The Second Circuit classifies marks along a spectrum from (1) generic to (2) descriptive

to (3) suggestive and to (4) arbitrary or fanciful. *See Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976); *Alzheimer's Disease & Related Disorders Ass'n, Inc. v. Alzheimer's Found. of Am., Inc.*, 307 F. Supp. 3d 260, 287 (S.D.N.Y. 2018). Marks that are descriptive or generic are not inherently distinctive. *Abercrombie & Fitch Co.*, 537 F.2d at 9. "A descriptive mark describes a product's features, qualities or ingredients in ordinary language, and may be protected only if secondary meaning is established." *Alzheimer's Disease*, 307 F. Supp. 3d at 287 (citation omitted). A generic term is one that is understood to refer to a product, either because it names the product or identifies a key characteristic of the product. *Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 826 F.3d 27, 41 (2d Cir. 2016); *Royal Crown Co. v. Coca-Cola Co.*, 892 F.3d 1358, 1367 (Fed. Cir. 2018); *Horizon Mills Corp. v. QVC, Inc.*, 161 F. Supp. 2d 208, 213 (S.D.N.Y. 2001). Generic terms can never be protected as trademarks. *See Guthrie Healthcare*, 826 F.3d at 41.

As the Court is aware, two separate district courts have already found the term "red gold" generic. *See Solid 21, Inc. v. Breitling USA Inc.*, 11-CV-0457 (GAF)(PLAx), 2011 WL 2938209, at *5 (C.D. Cal. July 19, 2011), and *Solid 21, Inc. v. Hublot of Am.*, 109 F. Supp. 3d 1313, 1331 (C.D. Cal. 2015). The *Breitling* decision was reversed on grounds that it was inappropriate to determine genericness on a motion to dismiss, and the *Hublot* decision was reversed upon a finding that Plaintiff had created a triable issue of fact on the issue of genericness. *See Solid 21, Inc. v. Breitling USA, Inc.*, 512 F. App'x 685 (9th Cir. 2013); *Solid 21, Inc. v. Hublot of Am.*, 685 F. App'x 530 (9th Cir. 2017). On the record present in this case, we believe that the Court can readily determine as a matter of law that Plaintiff's "red gold" trademark is invalid.

    i.    *The Term "Red Gold" Is a Generic Name For a Gold Alloy*

The evidence presented by Defendants proves as a matter of law that, long before

Plaintiff first used "red gold" as a trademark, the term was the generic name for a high copper

content gold alloy and for the category of jewelry and watches made of this alloy. While perhaps

not as well-known as yellow gold, platinum, or silver, red gold is just as generic.

Courts in the Second Circuit consider various evidence to determine whether a term is

generic, including: "(1) dictionary definitions; (2) generic use of the term by competitors and

other persons in the trade; (3) plaintiff's own generic use; (4) generic use in the media; and (5)

consumer surveys." *Tiffany & Co. v. Costco Wholesale Corp.*, 994 F. Supp. 2d 474, 482

(S.D.N.Y. 2014) (citation omitted). All of these categories of evidence point to genericism here.

*Dictionary Definitions*. The term "red gold" has been included in numerous dictionaries

and technical texts (akin to trade dictionaries) since at least as early as 1861. The expert report

of Gary L. Smith ("Smith Report"), a master goldsmith who has worked in the jewelry industry

for over 50 years and is a Graduate Gemologist of the Gemological Institute of America (GIA),

an accredited Master Gemologist Senior Appraiser from the American Society of Appraisers,

and a member of numerous jewelry industry societies, identifies more than 10 dictionaries and

technical texts defining "red gold" as a particular gold alloy containing copper. (Margiotta Decl.

¶ 2, Ex. 1.) Additionally, although not technically a dictionary but nonetheless an important

reference guide, the International Standards Organization ("ISO") – a worldwide federation of

national standards bodies – identifies red gold as one of the seven colored gold alloys, and

further sets forth the standard chemical composition of red gold. (*Id.*)

*Generic Use by Competitors and Other Persons in the Trade.* The evidence shows

extensive references to the use of the term "red gold" in the jewelry and watch industry. As

cataloged in the Smith Report, "red gold" has been widely identified in jewelry and

watchmaking reference materials since at least as early as 1872. (*Id.*) The Smith Report also

catalogs a multitude of references to "red gold" in trade journals and publications. (*Id.*) Further, the term "red gold" has been used by numerous jewelers and watchmakers in connection with jewelry and watches made of red gold, with evidence showing such use as far back as 1930. (*Id.*) Smith further reports that the 2001 through 2017 versions of the *Wristwatch Annual: The Catalogue of Producers, Prices, Models and Specifications*, an annual publication with information on watches produced by more than 100 brands, contain more than 1,300 different references to red gold as used in watch components described in the magazine. Those references included watches from at least 53 different manufacturers. (*Id.*) Of course, that Plaintiff has sued dozens of watch and jewelry companies in the past ten years further confirms that the term "red gold" is widely used by competitors as a generic designation. (*Id.* at Ex. 5, 42:6-43:19; ¶ 10 & Ex. 12)

　　　*Plaintiff's Own Generic Use*. Notwithstanding Plaintiff's claim of exclusive rights to the term "red gold," Plaintiff admitted at deposition that it only uses "red gold" with products that are made, at least in part, from the alloy red gold, stating that any product sold in its "red gold" collection "has to have some amount of amber hued gold in it." (*Id.* at Ex. 5, 127:4-22.) ("Amber hued gold" being Plaintiff's code for red gold.) The Smith Report details a technical test performed on a pendant from Plaintiff's "red gold" collection, which "confirm[ed] that the pendant is fabricated from generic red gold alloy" with a chemical composition matching "a type of common formula for red gold that has been used for hundreds of years through the world . . . fall[ing] between the 5N (red gold) and 6N (dark red gold) color designations in the ISO Standard 8654." (*Id.* ¶ 3.)

　　　*Generic Use in the Media*. The Smith Report also shows use of the term "red gold" in connection with watches and jewelry by the popular press from 1871 to the present. (*Id.*, Ex. 1.)

For example, the 1871 *New York Times* article "Bronzes and Jewelry" stated that "[s]ets of green and gold and of solid coral . . . are also coming into fashion." *Good Housekeeping* magazine mentioned red gold in a "glossary of jewelry terms" published in 1967. (*Id.*)

*Consumer Surveys*. Defendants commissioned Dr. David T. Neal of Catalyst Behavioral Sciences LLC, a research consulting firm specializing in the analysis of human decision making and consumer behavior, to test consumer perception of the term "red gold." (*Id.* ¶ 4.) The survey conducted by Dr. Neal followed the *Teflon* format, a standard genericism survey format regularly accepted by courts. *See* 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 12:16 (5th ed. 2021) (hereinafter "*McCarthy*") ("The most widely used survey format to resolve a genericness challenge is the 'Teflon' format."). That survey showed that 67% of respondents believe "red gold" to be a common name rather than a brand name, with only 16% indicating a belief that "red gold" is a brand name (17% indicated they did not know whether "red gold" was a common name or a brand name or had no opinion). (*Id.*) When those figures were corrected to eliminate respondents associated with the jewelry and watch industry, 69% believed "red gold" to be a common name, and only 14% believed it to be a brand name. (*Id.*) That is, more than four times as many consumers believe "red gold" to be a generic name. Dr. Neal indicated that this is one of "the strongest results in favor of genericism" that he has ever seen. (*Id.*) Dr. Neal's survey results are confirmed by the consumer survey of Defendants' expert Mark Keegan, whose survey showed that current and prospective purchases of luxury watches "do not identify 'red gold' as a brand" and that the term "red gold" further does not function as a brand in the purchase decision for Defendants' watches. (*Id.* ¶ 5.)

Taken together, the above evidence establishes, as a matter of law, that "red gold" is a generic term referring to a particular gold alloy and to watches and jewelry utilizing that alloy. It

is insincere for Plaintiff to maintain otherwise when *its own expert* was widely quoted in 2010 stating that "Alloy metal suppliers will vary the copper, but whether you call it red, pink or rose gold, it's all the same process." (Margiotta Decl. ¶ 9, Ex. 7.)

        ii.     *The Fact that "Red Gold" is a Generic Name For a Gold Alloy Renders it*
                       *Generic for Jewelry and Watches Made from that Alloy*

Perhaps bowing to the immensity of the evidence present on this record, Plaintiff appears to concede that "red gold" is a common term for a type of gold alloy from which jewelry and watch products are made. (Plaintiff's Pre-Motion Letter, ECF No. 125 at 2-3 ("[F]or purposes of its motion, Plaintiff takes this as true," i.e., that the term "'Red Gold' is the common term for a type of gold alloy that has a particular tint used as a material in the construction of watches and jewelry.")) Plaintiff, nevertheless, argues that this concession is not fatal to its exclusive ownership of "red gold" because it only means that "red gold" is a descriptive mark for watches and jewelry, describing an ingredient or compound of a product.[2] (*Id.*)

This argument is wrong as a matter of law. Contrary to Plaintiff's argument, "[g]eneric terms are not limited to nouns that directly name a product; instead, they may also be adjectives which name some distinctive characteristic of a genus of products." *Lemme v. Nat'l Broad. Co.*, 472 F. Supp. 2d 433, 441 (E.D.N.Y. 2007); *Horizon Mills*, 161 F. Supp. 2d at 213 ("Generic terms need not only be nouns that directly name a product, but also may be adjectives that designate a distinctive characteristic of a genus of products.").

---

[2] Since Plaintiff owns an "incontestable registration," *i.e.*, a trademark registration more than five years old, "red gold" cannot be invalidated upon a showing that the designation is descriptive. But the law is clear that incontestability does not preclude a finding of genericness. The Lanham Act explicitly provides that an incontestable trademark may be challenged—and its registration canceled—on the grounds of genericness. 15 U.S.C. § 1065(4) ("[N]o incontestable right shall be acquired in a mark which is the generic name for the goods or services or a portion thereof, for which it is registered"); 15 U.S.C. § 1064(3) (permitting cancellation of an incontestable registration for a mark which is a generic name).

Applying this law, while it is commonly understood that the name of a product can be a generic, it is equally clear that a term that identifies a "key aspect" of a product can also be generic. *See Royal Crown*, 892 F.3d at 1367 ("[A] term can be generic for a genus of goods or services if the relevant public . . . understands the term to refer to a *key aspect* of that genus.") (quoting *In re Cordua Rests., Inc.*, 823 F.3d 594, 603 (Fed. Cir. 2016) (emphasis added)); remanding case for determination of whether "zero" is generic for zero-calorie soda); *see also In re Cordua Rests.*, 823 F.3d at 603 ("[T]he test is not only whether the relevant public would itself use the term to describe the genus . . . . Any term that the relevant public understands to refer to the genus . . . is generic."; holding "churrasco," a generic term for a type of cooked meat, also generic for a restaurant featuring such meat) (citation omitted); *In re Helena Rubenstein, Inc.*, 410 F.2d 438, 440 (C.C.P.A. 1969) ("pasteurized" generic for face cream); *Roselux Chem. Co. v. Parsons Ammonia Co.*, 299 F.2d 855, 863 (C.C.P.A. 1962) ("sudsy" generic for aqua ammonia containing a synthetic detergent); *Sheetz of Del., Inc. v. Doctors Assocs. Inc.*, 108 U.S.P.Q.2d 1341, 1366 (T.T.A.B. 2013) ("footlong" held generic for a 12 inch long sandwich); *In re Cent. Sprinkler Co.*, 49 U.S.P.Q.2d 1194, 1199 (T.T.A.B. 1998) ("attic" held generic for automatic sprinklers used in attics); *Miller Brewing Co. v. G. Heileman Brewing Co.*, 561 F.2d 75, 80 (7th Cir. 1977) ("light" and "lite" generic for beer); 2 *McCarthy* § 12:10  (noting the Federal Circuit's "key aspect" test and collecting cases).

Considering the evidence of record and the applicable law, there is no question that the term "red gold" is generic for a gold metal alloy used to make jewelry and watches. Plaintiff's purported "red gold" mark is not valid, and Plaintiff's federal trademark registration should be canceled.

B.  *Defendants' Uses of Red Gold Are Not Likely to Cause Confusion*

Even if "red gold" were a valid mark, the evidence nonetheless establishes as a matter of law that Defendants' use of the term "red gold" have not caused any confusion over the past ten years and are not likely to in the future.

Courts in the Second Circuit apply the eight-factor *Polaroid* balancing test to determine whether confusion is likely. *See Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961). An analysis of these factors reveals that there is no likelihood of confusion here.

i.  *Plaintiff's Purported RED GOLD Trademark Is Weak*

Trademark strength "encompasses two different concepts, both of which relate to likelihood of consumer confusion." *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 147 (2d Cir. 2003). "The first and most important" kind of strength is conceptual strength or "inherent distinctiveness." As detailed above, "red gold" is the generic name for a gold alloy and for watch and jewelry products made from that alloy. At the very least "red gold" is highly descriptive as both admitted by Plaintiff for purposes of this motion and as shown by the same genericness evidence. "Red gold" is therefore is conceptually weak at a minimum. *See Saxon Glass Techs., Inc. v. Apple Inc.*, 824 F. App'x 75, 79 (2d Cir. 2020) ("The IONEX mark is conceptually weak because . . . it is a 'descriptive term' that refers to the chemical process by which Saxon strengthens glass."); *Alzheimer's Disease*, 307 F. Supp. 3d at 288 ("[T]he mark 'Alzheimer's Association' is descriptive . . . [and] is conceptually weak.").[3]

The second type of mark strength is marketplace strength or "'acquired distinctiveness,'

---

[3] An "incontestable" registration does not preclude a finding that a mark is weak and highly descriptive. *Saxon Glass Techs., Inc. v. Apple Inc.*, 393 F. Supp. 3d 270, 301-02 (W.D.N.Y. 2019), *aff'd*, 824 F. App'x 75 (2d Cir. 2020) ("[W]hile the incontestable status of the registration creates a conclusive presumption as to the validity of the mark, such incontestability does not prevent the defendants from questioning the strength of the mark and the scope of its protection.") (citation omitted).

*i.e.*, fame, or the extent to which prominent use of the mark in commerce has resulted in a high degree of consumer recognition." *Virgin Enters.*, 335 F.3d at 147. *Plaintiff's own expert conceded* that the purported "red gold" brand is nearly commercially invisible, that consumers who recognize it constitute a "micro universe," and that not many people have heard of it. (Margiotta Decl. ¶11, Ex. 9 at 19:10-12 and 84:13-22.). Plaintiff's expert further agreed that the brand "red gold' is not picked up in popular culture at all, and that it is fair to characterize the brand's sales as "small" and the number of American consumers who recognize it as "tiny," maybe as few as 50 people. (*Id.*, Ex. 9 at 24:20-25:11 and 46:7-49:4). *See Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 123 (2d Cir. 2001) (agreeing that plaintiff's mark is weak due to "low level of commercial success and small advertising budget").[4]

> ii.   *Defendant's Use of "Red Gold" Differs From Plaintiff's Purported "Red Gold" Mark*

While Defendants may have used the term "red gold," the manner in which Defendants used the term could not cause confusion. First, Defendants always used the term "red gold" in conjunction with their house marks. (Dubiez Decl. ¶ 10; Zaouk Decl. ¶ 12.) Numerous cases have held that prominent use of a house mark can lessen any likelihood of confusion. *See Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 46 (2d Cir. 2000) ("Warner–Lambert's prominent use of its well-known [DENTYNE] house brand therefore significantly reduces, if not altogether eliminates, the likelihood that consumers will be confused as to the source of the parties' products."); *W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 573 (2d Cir. 1993) (plaintiff's SPORTSTICK not similar to defendant's use of RIGHT GUARD SPORT STICK due to use of house mark); *Lopez v. Gap, Inc.*, 883 F. Supp. 2d 400, 421 (S.D.N.Y. 2012) (granting

---

[4] We have not included Plaintiff's sales and advertising numbers because Plaintiff considers them "confidential," and since it is Plaintiff's burden to demonstrate the marketplace strength of its mark, we leave it to Plaintiff to apply to the Court to file those documents under seal.

summary judgment to defendants and finding that the defendants' use of the house mark "Old Navy" on the t-shirt label lessened the likelihood of confusion with plaintiff's mark).

Further, Defendants only used "red gold" in relation to products made at least in part from the alloy red gold and in a context in which that reference was clear. (Dubiez Decl. ¶ 12; Zaouk Decl. ¶ 15.) The term almost invariably appeared in lower-case letters in small typeface and surrounded by other descriptive terms for the product being offered – such as in the case of an IWC watch identified as "18-carat red gold with brown calfskin strap," for example. (*See* Margiotta Decl., Ex. 4 for typical uses). Accordingly, the context in which Defendants used the term "red gold" is not similar to Plaintiff's use for purposes of analyzing likelihood of confusion. *See Hypnotic Hats, Ltd. v. Wintermantel Enters., LLC*, 335 F. Supp. 3d 566, 584 (S.D.N.Y. 2018) ("[D]ifferences in typeface, font and general presentation may lead to a finding that two marks are substantially different in use.") (citations omitted); *Medici Classics Prods. LLC v. Medici Grp. LLC*, 590 F. Supp. 2d 548, 554-55 (S.D.N.Y. 2008) (concluding that the marks created "a vastly different impression" on viewers considering the different coloring and the fact that one mark was presented in all capital letters); *SLY Magazine, LLC v. Weider Publ'ns L.L.C.*, 529 F. Supp. 2d 425, 439 (S.D.N.Y. 2007) (concluding that identical marks both used for magazines were nonetheless not similar where defendant's mark referred to the magazine's namesake Sylvester Stallone and was presented in block capital letters while plaintiff used an italicized script and the tagline "'Shoes . . . the Obsession'"). The similarity of the marks factor therefore weighs in Defendants' favor.

          *iii.*    <u>*The Relevant Consumers Are Sophisticated and Likely to Exercise a High Degree of Care*</u>

The next *Polaroid* factor examines the sophistication of the average consumer and the level of care they exercise when purchasing the products at issue. When evaluating this factor,

the Court "must consider [t]he general impression of the ordinary purchaser[s] buying under the normally prevalent condition of the market and giving the attention such purchasers usually give in buying that class of goods." *Conopco, Inc. v. Cosmair, Inc.*, 49 F. Supp. 2d 242, 256 (S.D.N.Y. 1999) (citation omitted). "Generally, the more sophisticated and careful the average consumer of a product is, the less likely it is that similarities in ... trademarks will result in confusion concerning the source or sponsorship of the product." *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1046 (2d Cir. 1992). Moreover, it is well settled that the greater the value of a certain kind of good, the more careful the typical consumer will be when making purchasing decisions. *See Gross v. Bare Escentuals Beauty, Inc.*, 641 F. Supp. 2d 175, 192 (S.D.N.Y. 2008) ("The greater the value of an article the more careful the typical consumer can be expected to be . . . .") (citation omitted).

Numerous courts have found that purchasers of expensive watches and jewelry are sophisticated, careful shoppers. *De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate, Inc.*, 440 F. Supp. 2d 249, 279 (S.D.N.Y. 2006) (noting that for expensive jewelry items like diamonds, "it is reasonable to assume that the typical consumer will spend more time considering the purchase . . . than almost any other good he or she buys"); *Cartier, Inc. v. Four Star Jewelry Creations, Inc.*, 348 F. Supp. 2d 217, 246 (S.D.N.Y. 2004) ("[S]ince Cartier's products are relatively expensive, [the sophistication of buyers] factor would presumably weigh against a finding of a likelihood of confusion."); *Swatch Grp. (U.S.) Inc. v. Movado Corp.*, 01-CV-0286 (RLC), 2003 WL 1872656, at *5 (S.D.N.Y. Apr. 10, 2003) ("[T]he care taken by consumers of expensive watches makes confusion due to the proximity of these goods unlikely . . . and [the] 'sophistication of the purchasers' factor[] weigh[s] in [defendant's] favor.").

The evidence supports the same conclusion here. In the instant case, both Plaintiff's "red

gold" products and Defendants' products are expensive jewelry and watches sold to wealthy consumers. Such products typically range in price from several thousand dollars to over $100,000. Due to the high prices associated with the parties' products, consumers of products from either Plaintiff or Defendants should be viewed as sophisticated and as exercising an extremely high degree of care and/or discrimination with respect to their purchases. (*See* Zaouk Decl. ¶ 25; Dubiez Decl. ¶ 18.) The sophistication factor therefore tips in Defendants' favor.

iv.  <u>No Evidence of Actual Confusion</u>

For more than a decade leading up to the commencement of this lawsuit, Defendants used the term "red gold" in connection with their products. Despite this, Plaintiff has produced no evidence of actual confusion resulting from such use and Defendants are not aware of any. (Dubiez Decl. ¶ 16; Zaouk Decl. ¶ 21.) Where two designations have co-existed for a substantial period of time with no incidents of actual confusion, courts have found this factor to weigh against likelihood of confusion. *See Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 117 (2d Cir. 2009) (coexistence of two marks "with no report of a single customer becoming confused is a powerful indication that there is no confusion." (internal quotation marks omitted)); *Plus Prods. v. Plus Disc. Foods, Inc.*, 722 F.2d 999, 1006 (2d Cir. 1983) ("[N]o evidence of confusion for over a three-year period, during which substantial sales occurred, is a strong indicator that the likelihood of confusion is minimal."); *Tommy Hilfiger Licensing, Inc. v. Nature Labs, LLC*, 221 F. Supp. 2d 410, 419 (S.D.N.Y. 2002) ("Where, as here, a product has been on the market for several years, the absence of evidence on this point is considered 'a very significant deficiency.'") (citation omitted). This *Polaroid* factor favors Defendants.

v.  <u>Defendants Did Not Use the Term "Red Gold" in Bad Faith</u>

"Bad faith generally refers to an attempt by a junior user of a mark to exploit the good will and reputation of a senior user by adopting the mark with the intent to sow confusion

between the two companies' products." *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 388 (2d Cir. 2005). Plaintiff has no evidence to support a finding that Defendants had any interest in sowing confusion. As noted earlier, Defendants only used "red gold" truthfully in reference to products made with red gold. In doing so, Defendants were just following industry custom, as Plaintiff's litigation record against other industry leaders shows. There is no evidence or argument that Defendant acted in bad faith, and therefore this factor supports a finding of no likelihood of confusion.

> ### vi.   *The Balance of the Polaroid Factors Weighs in Defendants' Favor*

The five *Polaroid* factors discussed above weigh heavily for Plaintiff. The remaining factors – the quality of Defendants' products, the similarity of the parties' products, and bridging the gap – favor Defendants as well. The quality of Defendants' products is beyond dispute, as these are three of the finer watch brands in the world. While parties' goods are all luxury watches and jewelry, the different aesthetics of the watches make them appeal to separate customer bases (Zaouk Decl. ¶ 24; Dubiez Decl. ¶ 18), and thus the parties' products are not similar. *La Cibeles, Inc. v. Adipar, Ltd.*, 99-CV-4129 (AGS), 2000 WL 1253240, at *8 (S.D.N.Y. Sept. 1, 2000) (finding no proximity of goods where the parties' perfume products sold at different price points, to different customers, and through different channels of distribution). And there is no likelihood that either party is going to "bridge the gap" between these disparate types of products: for the decades that Defendants have been in business, they have never concentrated on the "bling" market like Plaintiff does. (Margiotta Dec., Ex. 7 at 75:13-78:23; Zaouk Decl. ¶ 24; Dubiez Decl. ¶ 18.) *See Stephan Co. v. Elizabeth Arden, Inc.*, 06-CV-3871 (LTS)(FM), 2006 WL 8430160, at *7 (S.D.N.Y. Dec. 6, 2006) (finding "bridge the gap" factor in favor of defendants because "Plaintiff has not offered any evidence indicating that it intends to market its Interlude products

through the same prestige channels in which Defendants market their Provocative Interlude products.").

## II.        **Plaintiff's Dilution Claims Fail Because RED GOLD Is Not Famous or Distinctive**

Plaintiff's claims that Defendants have diluted the purported "red gold" mark also fail as a matter of law. Plaintiff's mark is neither anywhere near famous enough to qualify for protection under the federal dilution statute, nor sufficiently distinctive to qualify for protection under New York's dilution law. 15 U.S.C. § 1125(c)(2)(A) ("[A] mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner."); *Dentsply Sirona*, 2020 WL 1643891, at *4 (New York's dilution law requires an "'extremely strong'" mark) (quoting *Malaco Leaf, AB v. Promotion In Motion, Inc.*, 287 F. Supp. 2d 355, 367 (S.D.N.Y. 2003)). A mark known by (as Plaintiff's own expert's characterized it) a "micro-universe" of consumers cannot be diluted.

## III.       **The Court Should Extend its Fair Use Ruling to All of Defendants' Uses**

Given the proceeding arguments demonstrating that Plaintiff does not own a valid mark because "red gold" is generic and that, even if Plaintiff's claimed mark were valid, there is no likelihood of confusion or likelihood of dilution, the Court need not reach Defendants' affirmative defense of fair use. However, the Court would also be justified in expanding its prior ruling in this case on fair use to conclude that, as a matter of undisputed fact and law, all of Defendants' uses of "red gold" constitute fair use and therefore are insulated from claims of infringement or dilution. *See Something Old, Something New, Inc. v. QVC, Inc.*, 98-CV-7450 (SAS), 1999 WL 1125063, at *6 (S.D.N.Y. Dec. 8, 1999) (fair use defeats liability "even if a defendant's conduct would otherwise constitute infringement") (citation omitted).

In this Court's earlier Opinion, the Court already found that Defendants' use of the term

"red gold" in the IWC advertisement shown in Exhibit 17 of the TAC satisfied all of the requisite elements for the fair use defense, namely, the term was used (1) other than as a mark, (2) in a descriptive sense, and (3) in good faith. (Opinion at 15.) *See* 15 U.S.C. § 1115(b)(4); *EMI Catalogue P'ship v. Hill, Holiday, Connors, Cosmopulos Inc.*, 228 F.3d 56, 64 (2d Cir. 2000). The Court, however, declined to rule that the uses made by Defendants in TAC Exhibits 14 (of a BAUME & MERCIER watch) and 16 (of a MONTBLANC watch) were clearly fair use on the record available on a motion to dismiss. (Opinion at 11-12.) In so holding, the Court focused on the fact that "'[r]ed Gold' appears in the headings of the product listings" and that the product headings may be considered by consumers "separately significant" even if other text in the exhibits explains that the watches at issue contain the alloy red gold. (Opinion at 12-13.)

While the Court's earlier ruling on fair use was constrained by the procedural posture of a motion to dismiss, the Court should rule that the evidence of record on summary judgment establishes that all of Defendants' uses of "red gold," even those in the headings of product listings, are fair use.

As an initial matter, the fact that Defendants may have used "red gold" as part of product headers does not make it non-descriptive. *See Eli Lilly & Co. v. Revlon, Inc.*, 577 F. Supp. 477, 486 (S.D.N.Y. 1983) ("Emphasis of a descriptive term on packaging does not show that the term is being used as a trademark."). More important is the purpose of the use, and here the evidence shows conclusively that Defendants used the term "red gold" descriptively rather than as a trademark, even in product headers.

First, Defendants used the term *only* in connection with the sale of products that did in fact contain red gold alloy. (Dubiez Decl. ¶ 12; Zaouk Decl. ¶ 15.) "'A use of a mark is descriptive if the words were used to describe the ingredient, quality or composition of a product,

not the source of the product.'" (Opinion at 13 (quoting *Dessert Beauty, Inc. v. Fox*, 568 F. Supp. 2d 416, 425 (S.D.N.Y. 2008) (quotation marks omitted)).)

Second, even when Defendants included "red gold" in a product heading, "red gold" never appeared alone. Rather, Defendants always used their famous house marks whenever the term "red gold" appeared, often in the product name itself, or in close proximity thereto. (*See* Margiotta Decl. at Ex. 4; Dubiez Decl. ¶ 12; Zaouk Decl. ¶ 16.) Defendants also almost always used a secondary product name as well, and also usually included other descriptive terms (*e.g.*, "Montblanc Timewalker Red Gold Chronograph Automatic"). (*See* Margiotta Decl. at Ex. 4.) *See Cosmetically Sealed Indus., Inc. v. Chesebrough-Pond's USA Co.*, 125 F.3d 28, 30 (2d Cir. 1997) (non-trademark use of a phrase is "evidenced by the fact that the source of the defendants' product is clearly identified by the prominent display of the defendants' own trademarks"); *Naked Cowboy v. CBS*, 844 F. Supp. 2d 510, 515-16 (S.D.N.Y. 2012) (finding non-trademark use as a matter of law where defendant's YouTube channel prominently displayed the series title and the defendant's recognizable "eye" logo); *Arnold v. ABC, Inc.*, 06-CV-1747 (GBD), 2007 WL 210330, at *3 (S.D.N.Y. Jan. 29, 2007) (finding non-trademark use as a matter of law where defendant's ads and website prominently displayed the ABC trademark show title).

Moreover, all of the materials bearing a "red gold" model name or product header included further text indicating that the product was made, in part, of red gold. (Margiotta Decl. at Ex. 4.) *See Wonder Labs, Inc. v. Proctor & Gamble Co.*, 728 F. Supp. 1058, 1064 (S.D.N.Y. 1990) (holding that defendant's use of contested phrase was descriptive because it was often followed by explanatory phrases and always displayed in conjunction with other text).

With a fully developed record, the Court is now in a position to rule as a matter of fact and law that Defendants' use of the term "red gold" in connection with watch and jewelry

products that in fact contain the alloy known as red gold is descriptive, classic fair use and therefore does not infringe or dilute Plaintiff's purported "red gold" trademark.

**IV.**     **Defendants Should be Granted Judgment as a Matter of Law on All Intracompany Sales**

Should the Court disagree that summary judgment in Defendants' favor is warranted on all of the issues discussed above, there is nonetheless a subset of Defendants' sales that should be excluded from liability: nearly $4.9 million worth of sales made from the Europe-based Defendants Richemont International SA ("RISA) and Montblanc-Simplo GmbH ("Simplo") to Defendant RNA, the exclusive distributor of MONTBLANC, IWC, and BAUME & MERCIER products in the United States. (Dubiez Decl. ¶ 9; Zaouk Decl. ¶ 1.) It is impossible for any confusion to arise from transactions occurring between these affiliated entities.

Despite the impossibility of confusion arising based on sales from one Richemont entity to another, Plaintiff's damages expert, Jennifer Vanderhart, Ph.D., included as part of her damages calculation the revenues received by RISA and Simplo[5] from intracompany sales to RNA. (Margiotta Decl. at Ex. 6.) When asked about her inclusion of these sales, and specifically whether she believed confusion of any kind was likely to arise when Defendants were selling their products between companies, Ms. Vanderhart testified: "I haven't looked into that at all. I don't see why there would be." (Margiotta Decl. ¶ 8, Ex. 6 at 29:3-6.)

It bears noting that this is indisputably an unusual situation. As the Court knows from Defendants' prior motion to dismiss, RNA had a tolling agreement with Plaintiff that allowed RNA to continue using the term "red gold" without consequence for nearly a decade while Plaintiff litigated with Hublot. Not satisfied with suing the same Richemont entity with whom

---

[5] On the spreadsheets provided to Plaintiff and used by Dr. Vanderhaart to show Defendants' sales, RISA and Montblanc-Simplo sales were grouped together under "RISA." That is why Dr. Vanderhart only refers to RISA.

Plaintiff had entered the tolling agreement, Plaintiff named RISA and Montblanc-Simplo as defendants in this matter. But those companies make sales to only one entity in the entire United States, namely, their affiliated company, RNA. This transparent attempt at a cash grab by Plaintiff to avoid the consequences of its earlier tolling agreement should be rejected. There is no question that there can be no likelihood of confusion arising from sales between affiliated companies. Accordingly, the intracompany sales from RISA and Montblanc-Simplo to RNA totaling $4,899,661 (Margiotta Decl., Ex. 6 ¶ 28), should be excluded from the case since liability on those sales is impossible to establish as a matter of law.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully request that the Court grant their motion for summary judgment on the matters discussed herein and any other relief as the Court may deem just and proper.

Dated: New York, New York           FROSS ZELNICK LEHRMAN & ZISSU, P.C.
       September 16, 2021

                                    By: */s/* John P. Margiotta _____
                                      John P. Margiotta (*jmargiotta@fzlz.com*)
                                      Laura Popp-Rosenberg (*lpopp-rosenberg@fzlz.com*)
                                      Daniel M. Nuzzaci (*dnuzzaci@fzlz.com*)
                              151 West 42nd Street, 17th Floor
                              New York, NY  10036
                              Tel:  (212) 813-5900

                              *Attorneys for Defendants*