# **Exhibit 2**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SOLID 21, INC.<br><br>    Plaintiff,<br><br>    v.<br><br>RICHEMONT NORTH AMERICA, INC.; RICHEMONT INTERNATIONAL S.A.; and MONTBLANC-SIMPLO GMBH,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)  Case No. 1:19-cv-01262-LGS<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**Expert Report of David Neal Ph.D.**

I, Dr. David T. Neal, hereby declare as follows:

1. **Background and Assignment**

    1.1. I am an Executive in Residence at Duke University and Managing Partner of Catalyst Behavioral Sciences LLC, a research consulting firm specializing in the analysis of human decision making and consumer behavior. I have been asked to provide an expert declaration in the Matter of SOLID 21, INC. (hereafter, "Plaintiff" or "Solid 21") v. RICHEMONT NORTH AMERICA, INC.; RICHEMONT INTERNATIONAL S.A.; and MONTBLANC-SIMPLO GMBH (hereafter, "Defendants" or "Richemont") in the United States District Court for the Southern District of New York.

    1.2. At Catalyst Behavioral Sciences, I provide services for clients across a range of industries. Among others in the corporate sector, I act or have acted as a consultant to Bayer, Microsoft, Procter & Gamble, Intel, and Johnson & Johnson.

Among others in the public and non-profit sector, I act or have acted as a consultant to the World Bank, The Bill and Melinda Gates Foundation, The Centers for Disease Control and Prevention (CDC), USAID, and the Surgeon General of the U.S. Army.

1.3. I have more than fifteen years' experience conducting consumer and other scientific surveys. I have been retained as an expert in a variety of trademark, patent, and false advertising matters. I have also testified as a survey expert in federal court, the NAD, and ITC on multiple occasions. My Curriculum Vitae, attached as Exhibit A, summarizes my education, publications, and experience spanning both academic and commercial marketing research. My Curriculum Vitae also lists all cases which, during the previous four years, I testified as an expert in a deposition or at trial.

1.4. For the preparation of this report, I am being compensated at a rate of $585 per hour by the Defendants. Research assistants under my supervision are being compensated at a rate of $100 per hour. Compensation is not dependent in any way on the results of my work or my opinions.

1.5. I hold a Ph.D. in psychology from the University of Melbourne, Australia, awarded in 2005 and completed my post-doctoral training at Duke University, working in the psychology department and Fuqua School of Business. At Duke, I served as the Director of the Interdisciplinary Social Science Research Laboratories. I was then an assistant professor of psychology at the University of Southern California (USC). I have published extensively in the areas of consumer behavior and decision-making and have taught advanced research methods (including survey design), consumer behavior, and marketing courses at Duke University and USC. In 2012, I was the joint recipient (with Professor Wendy Wood) of the Park Outstanding Contributor Award presented by the Society for Consumer Psychology.

1.6. I have reviewed Plaintiff's Third Amended Complaint against Defendants and Plaintiff's Complaints against the other Defendants identified in Section 6.1 of this report. I have also reviewed the Answer to Third Amended Complaint, Affirmative Defenses and Counterclaims of Defendants, Plaintiff's Answer to Counterclaims of Defendants, and other materials noted in Section 6.1 and in footnotes

throughout this report.

1.7. Based upon my review of these documents, I understand that Plaintiff contends that the claimed "RED GOLD® mark has become famous, distinctive, and associated with, *inter alia*, luxury watches offered by Solid 21."[1] I further understand that Defendants deny these claims, and assert that "The term, "red gold," is not understood by the public as identifying Plaintiff as the source or origin of the products in connection with which Plaintiff uses such term."[2] Finally, I understand Defendants contend, instead, that "Plaintiff's purported RED GOLD mark is generic"[3] and is used "to describe and refer to a species of gold that has a reddish tint, usually resulting from a higher concentration of copper than is found, for example, in 'yellow gold' or 'white gold.'"[4]

1.8. To scientifically quantify relevant consumers' perceptions of the disputed term, I designed and executed a genericness survey, using the well-established Teflon format,[5] with a total of 218 respondents. The purpose of the survey was to objectively establish, using scientifically valid and reliable methods, whether the name RED GOLD is, in fact, generic when used by relevant consumers in the U.S., in connection with watches or jewelry made with precious metals.

1.9. Given that the genericness of a mark must be evaluated specifically within purchasers and "likely purchasers" of the relevant products or services,[6] I ensured that 100% of respondents had either purchased a watch or piece of jewelry made with precious metals in the last twelve months, or intended to do so in the next twelve months. In addition, I ensured that all respondents had spent, or intended to spend, a minimum of $2000 on that purchase.[7]

---

[1] Plaintiff's Third Amended Complaint, ¶ 22.
[2] Answer to Third Amended Complaint, Affirmative Defenses and Counterclaims of Defendants, ¶119.
[3] Answer to Third Amended Complaint, Affirmative Defenses and Counterclaims of Defendants, ¶123.
[4] Answer to Third Amended Complaint, Affirmative Defenses and Counterclaims of Defendants, ¶117.
[5] See Jay, E.D. "*Genericness Surveys in Trademark Disputes*" in <u>Trademark and Deceptive Advertising Surveys: Law, Science, and Design</u>, 101-144 (Shari S. Diamond & Jerre B. Swann, eds. 2012).
[6] See "*Genericness Surveys in Trademark Disputes*," *supra* n. 4*,* at 131-32 ("For a genericness survey, the proper universe is the relevant consuming public or those persons likely to rely on the challenged mark in making purchase decisions.").
[7] See (Q8-Q13, Exhibit B).

1.10. The sample selection, questionnaire design, and data analysis employed in the survey followed scientific best practice. The survey was designed to meet the criteria detailed in the Federal Judicial Center's <u>Manual for Complex Litigation, Fourth</u> and the <u>Reference Manual on Scientific Evidence, Third</u>. I elaborate on the scientific methods employed in the survey in subsequent sections of this Declaration.

2. **Summary of Key Findings**

   2.1. To scientifically determine whether the name RED GOLD is perceived to be a brand name or a common name (i.e., a generic term), I conducted a study with a total of 218 respondents. The survey was fielded in August 2019.

   2.2. It is my considered opinion that the results of the survey clearly and strongly support a conclusion that purchasers and likely purchasers in the United States of jewelry and watches made with precious metals perceive the name RED GOLD to be a generic term, or common name, used to describe a category of products, rather than a brand name for the products of one company. I base that conclusion on several methodological factors and several empirical findings from my survey:

      2.2.1. First, the 218 respondents randomly selected to take part in the survey I conducted were carefully screened in a non-leading manner to match purchasers and likely purchasers of watches and jewelry products made with precious metals in the U.S.

      2.2.2. Second, I followed scientific best-practice in the design and execution of the Teflon-format survey I conducted, including random assignment, double-blind survey fielding, and counterbalancing the order of "brand name" and "common name" responses across respondents.

      2.2.3. Third, among the 218 purchasers and likely purchasers who qualified to take the survey, an overwhelming majority (67.0%, or 146 out of 218) indicated that RED GOLD is a common name. 17.0% (37 out of 218) of respondents indicated they don't know/have no opinion, and only 16.1% (35 out of 218) indicated that RED GOLD is a brand name.

      2.2.4. Fourth, after excluding seventeen respondents who indicated at the end of the survey that they had some kind of affiliation with the jewelry or watch

industry, an overwhelming majority continued to indicate that they regard RED GOLD to be a common name. Specifically, among the 201 remaining purchasers and likely purchasers who qualified to take the survey and did not have any industry affiliation, an overwhelming majority (68.7%, or 138 out of 201) indicated that RED GOLD is a common name. 16.9% (34 out of 201) of respondents indicated they don't know/have no opinion, and 14.4% (29 out of 201) indicated that RED GOLD is a brand name.

2.3. Based on the results of this scientific survey, my training and education, and my professional experience conducting consumer and trademark research, it is my considered opinion that, among purchasers and likely purchasers of watches and jewelry made with precious metals in the U.S., the primary significance of RED GOLD is a generic term used to describe a category of products and is not perceived to be a brand name.

2.4. Moreover, having conducted and reviewed many Teflon surveys, I note that the survey here has one of the strongest results in favor of genericism that I have yet observed, with more than four times as many relevant consumers indicating that RED GOLD is a generic term (68.7%) than indicated it is a brand name (14.4%). Of particular importance, the 68.7% generic term finding far exceeds the 50% threshold that I understand courts[8,9] have used to establish the "primary significance" of a term. Thus, by even the most conservative standard, RED

---

[8] See "*Genericness Surveys in Trademark Disputes*," *supra* n. 4. "The Trademark Clarification Act of 1984 explicitly stated that the primary significance of the registered mark rather than purchaser motivation shall be the test for determining whether the registered mark has become generic."

[9] See Ford, Gerald L. "*Survey Percentages in Lanham Act Matters*" in Trademark and Deceptive Advertising Surveys: Law, Science, and Design, 311-326 (Shari S. Diamond & Jerre B. Swann, eds. 2012). As Dr. Ford put it: "Commentators have opined that the principal or primary significance of a term or designation is determined by the majority understanding of the term or designation by the target group of persons to whom the product or service is directed. With respect to survey evidence, courts have generally ruled in agreement with these commentators, finding a term or designation generic (i.e., a common name) when survey percentages, along with other factors, establish that a majority of the relevant universe understands the term or designation as a common name."

GOLD is clearly a generic term and not a brand name among purchasers and likely purchasers of watches and jewelry made with precious metals in the U.S.

3. **Sampling and Methodology**
    3.1. Attached as Exhibit B is a copy of the Teflon questionnaire I fielded to quantify consumer perception of whether RED GOLD is perceived to be a common name or a brand name. The Teflon survey format is a well-recognized and long-accepted format for testing whether a term is understood by consumers to be a generic term (i.e., "a common name") or a brand name. I closely followed accepted practice in Teflon surveys[10] including adopting language verbatim from the original Teflon design. In this approach, the name being tested (in this case, RED GOLD) is included among a group of other terms, half of which are likely understood by consumers as brand names, and half of which are likely understood as common names. This format is advantageous because it has built-in controls (the other names) and does not draw excessive attention to the name in question. Following standard practice in Teflon surveys, I counterbalanced the order in which "brand name" and "common name" appeared in the survey, such that some respondents always saw "brand name" first and "common name" second (see Version 1 in Exhibit B), whereas other respondents always saw "common name" first and "brand name" second (see Version 2 in Exhibit B). Aside from that variation, Version 1 and 2 of the survey were identical.
    3.2. Attached as Exhibit C is a copy of survey respondents' verbatim answers to each survey question.
    3.3. I was responsible for the design of the survey, as well as for the procedures to be followed in conducting the survey. Data collection was conducted using the Qualtrics online survey platform. Panelists were provided by Dynata (formerly, SSI), an industry-leading provider of survey respondents for research studies.
    3.4. The panelist provider, Dynata, uses digital fingerprinting and location confirmation based on IP address to verify the identity of 100% of respondents. In addition, Dynata uses a variety of best-practice quality control metrics (e.g., double-opt-in engaged panelists, straight-line analysis, speedster analysis) in monitoring

---

[10] See "*Genericness Surveys in Trademark Disputes*," *supra* n. 4.

panelists in its database.

3.5. The survey exceeded the threshold commonly known as the "double-blind protocol." Specifically, respondents were not informed of the purpose or sponsor of the survey, and thus were "blind" to this information. By virtue of being conducted through an automated online survey platform, the survey also removed any potential for interviewer bias or errors in data recording. Thus, the data collection method was also "blind" to the hypotheses being tested.

3.6. The relevant universe for a genericness survey is "those persons likely to rely on the challenged mark in making purchase decisions."[11] Accordingly, I screened respondents to ensure they (a) had purchased, for $2000 or more, a watch made with a precious metal or a piece of jewelry, other than a watch, made with a precious metal, in the past twelve months, or (b) were likely to purchase, for $2000 or more, a watch made with a precious metal or a piece of jewelry, other than a watch, made with a precious metal in the next twelve months.

3.7. By screening respondents in this way, I generated a sample of relevant consumers "likely to rely" on the challenged mark in making purchase decisions. Moreover, I note that these screening criteria specifically encompass products sold by both Plaintiff and Defendant in connection with the term RED GOLD. For example, the vast majority of products sold on Plaintiff's website (www.chrisaire.com and https://chrisaire.com/collections/signature-red-gold) in the "Signature RED GOLD Collection" sell for $2000 or more. Similarly, I understand that watches sold by Defendants using the term "red gold" exclusively, or almost exclusively, sell for $2000 or more[12] and that all of the Defendants' watches identified in Plaintiff's Complaint are sold for $2000 or more.[13]

3.8. Finally, I instructed Dynata to recruit specifically from the U.S., using the click balancing method to ensure that survey starts were representative of the general population. Through the use of the screening questions described above, I then narrowed from the U.S. general population to the relevant universe: purchasers and likely purchasers of watches and jewelry, valued at $2000 or more, made with a precious metal.

---

[11] See "*Genericness Surveys in Trademark Disputes*," *supra* n. 4, at 131-32.
[12] For example, see RMTI 0012438-RMTI 0012452.
[13] Plaintiff's Third Amended Complaint, ¶ 36-¶ 40.

3.9. As is my standard practice, I paused fielding of the survey after collecting a small number of respondents in order to review the data and survey administration platform. This step fulfills the function of a pilot or pre-test and, after observing no issues with the survey, I proceeded to re-launch fielding and complete data collection.

4. **Detailed Survey Results**

    4.1. In this Section, I describe each question asked in the survey I conducted. I also provide a table of results for each question, combining results for Version 1 (brand name first) and Version 2 (common name first).

    4.2. Tables 1 and 2 below provide the results of Questions 1 (gender) and 3 (age) in the two versions of the survey. Question 2 was a CAPTCHA question used as a quality control metric and attention check, so no data was saved.

    Question 1.

    What is your gender?

    **[RANDOMIZE; SELECT ONE RESPONSE]**
    1. Male
    2. Female

    **Table 1.** Results for Q1: Gender Composition (Total N=218).

    |  | Full Sample (N=218) |
    |---|---|
    | **Males** | 136 (62.4%) |
    | **Females** | 82 (37.6%) |
    | **Total** | 218 (100.0%) |

    Question 2.

    Please verify that you are a human by completing the task below.
    **[INSERT CAPTCHA TASK]**

    Question 3.

    In which of the following categories does your age fall?
    1. Under 18 **[TERMINATE]**
    2. 18 to 24
    3. 25 to 44
    4. 45 to 64

5. 65 or above
6. Refuse to answer **[TERMINATE]**

**Table 2.** Results for Q3: Age Composition (Total N=218).

|  | Full Sample (N=218) |
|---|---|
| **18 to 24 years** | 6 (2.8%) |
| **25 to 44 years** | 84 (38.5%) |
| **45 to 64 years** | 82 (37.6%) |
| **65 years or above** | 46 (21.1%) |
| **Total** | 218 (100.0%) |

4.3. Via Questions 4-13 shown below, I then screened respondents to ensure that they (a) were completing the survey on a laptop computer, desktop computer, tablet, or smartphone (Q4, Exhibit B), (b) lived in the U.S. (Q5, Exhibit B), (c) passed an attention check[14] (Q6, Exhibit B), (d) did not work, or live with someone who worked in advertising or marketing (Q7, Exhibit B), (e) purchased a watch made with a precious metal or a piece of jewelry, other than a watch, made with a precious metal, in the past twelve months (Q8, Exhibit B), or were likely to purchase a watch made with a precious metal or a piece of jewelry, other than a watch, made with a precious metal in the next 12 months (Q9, Exhibit B), (f) paid at least $2000 for the watch or piece of jewelry (Q10 and Q11, Exhibit B), or were likely to pay at least $2000 for a watch or piece of jewelry (Q12 and Q13, Exhibit B). Questions 10 and 11 were only asked if respondents selected a watch or piece of jewelry at Q8, and Questions 12 and 13 were only asked if respondents selected a watch or piece of jewelry at Q9. Tables 3-12 below provide detailed results for each question.

Question 4.

Please indicate below the device you are using to take this survey.
**[SELECT ONE RESPONSE] [RANDOMIZE ORDER OF RESPONSES BELOW; EXCEPT FINAL TWO WHICH REMAIN IN FIXED POSITION AT BOTTOM]**

1. Laptop computer **[CONTINUE]**

---

[14] This attention check item serves as a quality control measure and allowed me to identify and exclude any respondents who were not paying attention to the survey.

2. Desktop computer **[CONTINUE]**
3. Tablet **[CONTINUE]**
4. Smartphone **[CONTINUE]**
5. Other type of device not listed above **[TERMINATE]**
6. Don't know/not sure **[TERMINATE]**

**Table 3.** Results for Q3: Device Type (N=218).

|  | **Full Sample (N=218)** |
|---|---|
| **Laptop computer** | 57 (26.1%) |
| **Desktop computer** | 45 (20.6%) |
| **Tablet** | 31 (14.2%) |
| **Smartphone** | 85 (39.0%) |
| **Total** | 218 (100.0%) |

Question 5.

In what state do you live?
**[DROP DOWN MENU OF STATES PLUS PUERTO RICO AND D.C. INCLUDE AN OPTION FOR "OTHER" AND TERMINATE IF SELECTED]**

**Table 4.** Results for Q5: State of Residence (N=218).

|  | **Full Sample (N=218)** |
|---|---|
| **U.S. resident** | 218 (100.0%) |
| **Total** | 218 (100.0%) |

Question 6.

In order to continue with the survey, please choose the number six in the list of numbers below.

1. 1 **[TERMINATE]**
2. 2 **[TERMINATE]**
3. 3 **[TERMINATE]**
4. 4 **[TERMINATE]**
5. 5 **[TERMINATE]**
6. 6 **[CONTINUE]**
7. 7 **[TERMINATE]**
8. 8 **[TERMINATE]**

**Table 5.** Results for Q6: Attention Check (N=218).

|  | Full Sample (N=218) |
|---|---|
| **Selected the number 6** | 218 (100.0%) |
| **Total** | 218 (100.0%) |

Question 7.

Do you, or does anyone in your household, work for any of the following types of companies? Select all that apply.
**[RANDOMIZE]**

1. An advertising agency **[TERMINATE]**
2. A market research firm **[TERMINATE]**
3. None of these **[ANCHOR; EXCLUSIVE]**

**Table 6.** Results for Q7. Affiliation with Advertising or Market Research (N=218).

|  | Full Sample (N=218) |
|---|---|
| **None of these** | 218 (100.0%) |
| **Total** | 218 (100.0%) |

Question 8.

In the past 12 months, which of the following, if any, have you personally purchased for yourself or for someone else?
**[RANDOMIZE; MULTI-SELECT]**
1. A watch made with a precious metal
2. A piece of jewelry, other than a watch, made with a precious metal
3. A vacation on a cruise ship
4. A vacation involving an overseas flight
5. An LCD or LED television with a 4k screen
6. An LCD or LED television with a 5k screen
7. None of the above **[ANCHOR; EXCLUSIVE]**

**Table 7a.** Results for Q8_1: Purchase of a Watch Made with a Precious Metal in the Past Twelve Months (N=218).

|       | Full Sample (N=218) |
|-------|---------------------|
| Yes   | 61 (28.0%)          |
| No    | 157 (72.0%)         |
| Total | 218 (100.0%)        |

**Table 7b.** Results for Q8_2: Purchase of a Piece of Jewelry, Other than a Watch, Made with a Precious Metal in the Past Twelve Months (N=218).

|       | Full Sample (N=218) |
|-------|---------------------|
| Yes   | 162 (74.3%)         |
| No    | 56 (25.7%)          |
| Total | 218 (100.0%)        |

Question 9.

And thinking about the next 12 months, which of the following, if any, are you personally likely to purchase for yourself or for someone else?
**[RANDOMIZE; MULTI-SELECT]**
1. A watch made with a precious metal
2. A piece of jewelry, other than a watch, made with a precious metal
3. A vacation on a cruise ship
4. A vacation involving an overseas flight
5. An LCD or LED television with a 4k screen
6. An LCD or LED television with a 5k screen
7. None of the above **[ANCHOR; EXCLUSIVE]**

**Table 8a.** Results for Q9_1: Likely to Purchase a Watch Made with a Precious Metal in the Next Twelve Months (N=218).

|       | Full Sample (N=218) |
|-------|---------------------|
| Yes   | 70 (32.1%)          |
| No    | 148 (67.9%)         |
| Total | 218 (100.0%)        |

**Table 8b.** Results for Q9_2: Likely to Purchase a Piece of Jewelry, Other than a Watch, Made with a Precious Metal in the Next Twelve Months (N=218).

|  | Full Sample (N=218) |
|---|---|
| **Yes** | 145 (66.5%) |
| **No** | 73 (33.5%) |
| **Total** | 218 (100.0%) |

Question 10.

You indicated that you have purchased a watch made with a precious metal within the last 12 months. If you recall, what is the most you paid for a watch made with a precious metal in the last 12 months?

1. Less than $250
2. $250-$749
3. $750-$1249
4. $1250-$1999
5. $2000-$3999
6. $4000 or more
7. I don't recall

**Table 9.** Results for Q10: Most Paid for a Watch Made with a Precious Metal in the Last Twelve Months (N=61).

|  | Full Sample (N=61) |
|---|---|
| **Less than $250** | 0 (0.0%) |
| **$250-$749** | 1 (0.5%) |
| **$750-$1249** | 1 (0.5%) |
| **$1250-$1999** | 6 (2.8%) |
| **$2000-$3999** | 35 (16.1%) |
| **$4000 or more** | 18 (8.3%) |
| **I don't recall** | 0 (0.0%) |
| **Total** | 61 (28.0%) |

Question 11.

You indicated that you have purchased a piece of jewelry, other than a watch, made with a precious metal within the last 12 months. If you recall, what is the most you

paid for a piece of jewelry, other than a watch, made with a precious metal in the last 12 months?

1. Less than $250
2. $250-$749
3. $750-$1249
4. $1250-$1999
5. $2000-$3999
6. $4000 or more
7. I don't recall

**Table 10.** Results for Q11: Most Paid for a Piece of Jewelry, Other than a Watch, Made with a Precious Metal in the Last Twelve Months (N=162).

|  | Full Sample (N=162) |
|---|---|
| Less than $250 | 1 (0.5%) |
| $250-$749 | 2 (0.9%) |
| $750-$1249 | 10 (4.6%) |
| $1250-$1999 | 27 (12.4%) |
| $2000-$3999 | 82 (37.6%) |
| $4000 or more | 39 (17.9%) |
| I don't recall | 1 (0.5%) |
| Total | 162 (74.3%) |

Question 12.

You indicated that you are likely to purchase a watch made with a precious metal in the next 12 months. If you have an opinion, what are you likely to pay for a watch made with a precious metal in the next 12 months?

1. Less than $250
2. $250-$749
3. $750-$1249
4. $1250-$1999
5. $2000-$3999
6. $4000 or more
7. I'm not sure/no opinion

## 5. Conclusions Regarding RED GOLD

5.1. It is my considered opinion that the results of the survey I conducted in this matter clearly and strongly support a conclusion that purchasers and likely purchasers of watches and other jewelry made with precious metals do not perceive the name RED GOLD to be a brand name and, instead, perceive the name to be a common name, or generic term, describing a general category of products. I base that conclusion on several methodological factors and empirical findings from my survey:

5.1.1. First, the 218 respondents randomly selected to take part in the survey I conducted were carefully screened in a non-leading manner to match purchasers and likely purchasers of watches and jewelry products made with precious metals in the U.S.

5.1.2. Second, I followed scientific best-practice in the design and execution of the Teflon-format survey I conducted, including random assignment, double-blind survey fielding, and counterbalancing the order of "brand name" and "common name" responses across respondents.

5.1.3. Third, among the 218 purchasers and likely purchasers who qualified to take the survey, the vast majority, 67.0% (146 out of 218), indicated that RED GOLD is a common name.

5.1.4. Fourth, after excluding seventeen respondents who indicated some kind of affiliation with the jewelry or watch industry, an overwhelming majority continued to indicate that they regard RED GOLD to be a common name. Specifically, 68.7% (138 out of 201) indicated that RED GOLD is a common name. In contrast, merely 14.4% (29 out of 201) indicated that RED GOLD is a brand name.

5.1.5. Having conducted and reviewed many Telfon surveys, I note that the survey here has one of the strongest results in favor of genericism that I have yet observed, with more than four times as many relevant consumers indicating that RED GOLD is a generic term (68.7%) than indicated it is a brand name (14.4%). Moreover, the 68.7% generic term finding far exceeds the majority