UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SOLID 21, INC.,<br><br>     Plaintiff,<br><br>     v.<br><br>RICHEMONT NORTH AMERICA, INC.;<br>RICHEMONT INTERNATIONAL S.A.; and<br>MONTBLANC-SIMPLO GMBH,<br><br>     Defendants. | Civil Action No. 1:19-cv-01262-LGS |

**PLAINTIFF SOLID 21, INC.'S CROSS-MOTION FOR SUMMARY JUDGMENT AND
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## **TABLE OF CONTENTS**

I.   INTRODUCTION ...................................................................................................1

II.  STATEMENT OF FACTS ......................................................................................2

    A.   Solid 21's Incontestable RED GOLD® Trademark .....................................2

    B.   RED GOLD® Infringement ........................................................................3

III. SUMMARY JUDGMENT STANDARD ................................................................5

IV.  SOLID 21'S CROSS-MOTION FOR SUMMARY JUDGMENT ..........................6

    A.   Incontestable Status Affords Greater Protection to a Trademark ...........................6

    B.   Richemont's Trademark Invalidity Argument is Based on Descriptiveness, Not Genericness ..............................................................................................8

V.   SOLID 21'S OPPOSITION TO RICHEMONT'S MOTION FOR SUMMARY JUDGMENT ........................................................................................................12

    A.   Genuine Issues of Material Fact Abound on the Genericness Inquiry .................13

        1.   RED GOLD®'s Incontestable Status is Strong Evidence of Validity ......14

        2.   Dictionaries Demonstrate That RED GOLD® is Not Generic ................14

        3.   Survey Evidence Demonstrates That RED GOLD® is Not Generic ........16

        4.   Consumer Perception Shows RED GOLD® to be a Brand .....................17

        5.   Persons in the Trade View RED GOLD® as a Brand .............................17

        6.   Availability of Alternative Terms to RED GOLD® Cuts Against Genericness ..............................................................................................18

        7.   Solid 21's Extensive Evidence Precludes a Finding of Genericness as a Matter of Law .........................................................................................18

    B.   A Likelihood of Confusion Implicates Numerous Disputed Factual Issues .........19

        1.   Strength of the mark .................................................................................20

        2.   Similarity of products and bridging the gap ............................................21

        3.   Similarity of the marks .............................................................................22

        4.   Good or bad faith in adopting the mark....................................................23

        5.   Sophistication of buyers and degree of care ............................................24

        6.   Actual confusion......................................................................................24

i

       7.     Balancing the Polaroid factors .................................................................. 25

   C.    Richemont Cannot Prove All Fair Use Elements as a Matter of Law .................. 25

       1.     Use in a descriptive sense ........................................................................ 26

       2.     Use other than as a mark ......................................................................... 26

       3.     Use made in good or bad faith ................................................................. 28

   D.    There is No Basis for Exempting Richemont's Intracompany Sales From
        Damages ................................................................................................................ 29

VI.  CONCLUSION ................................................................................................................ 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC*,
  131 F. Supp. 3d 196 (S.D.N.Y. 2015) ....................................................................14

*Aldrich v. Randolph Cent. Sch. Dist.*,
  963 F.2d 520 (2d Cir.1992) ...................................................................................5

*Am. Ort, Inc. v. Israel*,
  No. 07-2332, 2007 WL 2049733 (S.D.N.Y. July 17, 2007) ..................................13

*American Exp. Marketing and Development Corp. v. Black Card LLC*,
  No. 10 Civ. 1605(DLC), 2011 WL 5825146 (S.D.N.Y. Nov. 17, 2011) .............10

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ...............................................................................................5

*Arrow Fastener Co., Inc. v. Stanley Works*,
  59 F.3d 384 (2d. Cir. 1995) ..................................................................................25

*Bristol-Myers Squibb Co. v. McNeil-P.P.C. Inc.*,
  973 F.2d 1033 (2d Cir. 1992) ............................................................................6, 7

*Black & Decker Corp. v. Dunsford*
  944 F. Supp. 220 (S.D.N.Y. 1996).  .....................................................................10

*Cadbury Beverages, Inc. v. Cott Corp.*,
  73 F.3d 474 (2d Cir. 1996) ...............................................................6, 20, 25, 29

*Calista Enterprises Ltd. v. Tenza Trading Ltd.*,
  43 F.Supp.3d 1099 (D. Or. 2014) .........................................................................17

*Cello Holdings, L.L.C. v. Lawrence-Dahl Companies*,
  89 F. Supp. 2d 464 (S.D.N.Y. 2000) .......................................................................5

*Coca-Cola Co. v. Seven-Up Co.*,
  497 F.2d 1351 (C.C.P.A. 1974)............................................................................15

*Dieter v. B & H Indus. of Southwest Fla., Inc.*,
  880 F.2d 322 (11th Cir. 1989) .............................................................................20

*Door Sys. v. Pro-Line Door Sys.*,
  83 F.3d 169 (7th Cir. 1996) .............................................................................15, 18

*Eagle Snacks, Inc. v. Nabisco Brands, Inc.*,
 625 F. Supp. 571 (D.N.J. 1985) ...................................................................................... 11

*EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos*,
 228 F.3d 56 (2d Cir. 2000) ..................................................................................... *passim*

*Energy Servs. Air Conditioning & Heating Co. v. NICOR, Inc.*,
 No. 97-C373, 1997 U.S. Dist. LEXIS 20660 (N.D. Ill. Dec. 22, 1997) ................................ 19

*Flag Co., Inc. v. Chan*,
 454 F. App'x. 776 (11th Cir. 2011) .............................................................................. 11

*Frehling Enters., Inc. v. Int'l Select Group, Inc.*,
 192 F.3d 1330 (11th Cir. 1989) .................................................................................... 8

*Gimix, Inc. v. JS&A Grp.*,
 699 F.2d 901 (7th Cir. 1983) ..................................................................................... 15

*Hasbro, Inc. v. Lanard Toys, Ltd.*,
 858 F.2d 70 (2d. Cir. 1988) ...................................................................................... 25

*Haydon Switch and Instrument, Inc. v. Rexnord, Inc.*,
 Civ. No. N 86-190(JAC), 1987 WL 26062 (D. Conn. June 4, 1987) ............................... 9, 10

*Haynes Intern., Inc. v. Electralloy*,
 No. CIV. 04-197E, 2009 WL 789918 (W.D. Pa., Mar. 24, 2009) ...................................... 18

*Henri's Food Prods. Co., Inc. v. Tasty Snacks, Inc.*,
 817 F.2d 1303 (7th Cir. 1987) .................................................................................... 11

*Horizon Mills Corp. v. QVC, Inc.*,
 161 F. Supp. 2d 208 ................................................................................................ 19

*Ideal World Marketing, Inc. v. Duracell, Inc.*,
 15 F. Supp. 2d 239 (E.D.N.Y. 1998) ............................................................................ 10

*In re Seats, Inc.*
 757 F.2d 274 (Fed. Cir. 1985) ............................................................................... 11, 12

*Investacorp, Inc. v. Arabian Inv. Banking Corp.*,
 931 F.2d 1519 (11th Cir. 1991) ................................................................................. 10

*Jahr USA Pub. v. Meredith Corp.*,
 991 F.2d 1072 (2d. Cir. 1993) ............................................................................. 7, 8, 9

*Kelly-Brown v. Winfrey*,
 717 F.3d 295 (2d. Cir. 2013) .................................................................................... 28

iv

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*,
  408 F.3d 596 (9th Cir. 2005) ............................................................................5

*Lifeguard Licensing Corp. v. Ann Arbor T-Shirt Co., LLC*,
  No. 15 CIV. 8459 (LGS), 2017 WL 314272 (S.D.N.Y. July 24, 2017) ................................ 16

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*,
  799 F.2d 867 (2d. Cir. 1986) ........................................................................ 25

*McKillip Indus. v. Integrated Label Corp.*,
  477 F. Supp. 2d 928 (N.D. Ill. 2006) ................................................................. 19

*Nat. Organics, Inc. v. Nutraceutical Corp.*,
  426 F.3d 576 (2d Cir. 2005) .......................................................................... 20

*PaperCutter, Inc. v. Fay's Drug Co., Inc.*,
  900 F.2d 558 (2d Cir. 1990) .......................................................................... 11

*Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*,
  469 U.S. 189 (1985) ................................................................................ 7, 8

*Perfect Pearl Co., Inc. v. Majestic Pearl & Stone, Inc.*,
  887 F. Supp. 2d 519 (S.D.N.Y. 2012) .................................................................. 11

*Pfizer Inc. v. Astra Pharmaceutical Prods., Inc.*,
  858 F. Supp. 1305 (S.D.N.Y. 1994) .................................................................... 11

*Polaroid Corp. v. Polarad Elecs. Corp.*,
  287 F.2d 492 (2d Cir. 1961) .................................................................. 19, 20, 25

*Q–Tips, Inc. v. Johnson & Johnson*,
  108 F. Supp. 845 (D.N.J. 1952) ....................................................................... 18

*RVC Floor Décor, Ltd. v. Floor and Décor Outlets of Am., Inc.*,
  2:18-cv-6449, 2021 WL 1163117 (E.D.N.Y. Mar. 18, 2021) .............................................. 22

*Savin Corp. v. Savin Grp.*,
  391 F.3d 439 (2d Cir. 2004) .......................................................................... 14

*Schering Corp. v. Pfizer Inc.*,
  189 F.3d 218 (2d Cir. 1999), *as amended on reh'g* ................................................... 17

*Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*,
  391 F.3d 77 (2d Cir. 2004) ............................................................................5

*Self-Realization Fellowship Church v. Ananda Church of Self-Realization*,
  59 F.3d 902 (9th Cir. 1995) .......................................................................... 17

v

*Solid 21, Inc. v. Breitling U.S.A., Inc. et al.*,
 No. 3:19-cv-00514 (MPS), 2021 WL 4430755 (D. Conn. Sept. 27, 2021) ....................*passim*

*Solid 21, Inc. v. Hublot of Am.*,
 685 F. App'x. 530 (9th Cir. 2017)...................................................................................*passim*

*Soweco, Inc. v. Shell Oil Co.*,
 617 F.2d 1178 (5th Cir. 1980) ...............................................................................................9

*Spectrum Vision Sys., Inc. v. Spectera, Inc.*,
 35 F. Supp. 2d 797 (D. Kan. 1998) ......................................................................................29

*Star Industries, Inc. v. Bacardi & Co. Ltd.*,
 412 F.3d 373 (2d Cir. 2005) ..............................................................................................6, 7

*The Sports Authority, Inc. v. Prime Hospitality Corp.*,
 89 F.3d 955 (2d Cir. 1996) ..................................................................................................20

*Therapy Prods., Inc. v. Bissoon*,
 623 F. Supp. 2d 485 (S.D.N.Y. 2009) ..................................................................................11

*Tiffany & Co. v. Costco Wholesale Corp.*,
 994 F. Supp. 2d 474 (S.D.N.Y. 2014) ..................................................................................13

*Welding Servs., Inc. v. Forman*,
 509 F.3d 1351 (11th Cir. 2007) .............................................................................................9

*Wright v. Warner Books, Inc.*,
 953 F.2d 731 (2d Cir. 1991) ................................................................................................26

**Statutes**

15 U.S.C. § 1065 ......................................................................................................................3, 7

15 U.S.C. § 1115(b)......................................................................................................................14

**Rules**

Fed. R. Civ. P. 56 ........................................................................................................................1, 5

Local Civil Rule 56.1 ..............................................................................................................1, 2, 16

Pursuant to Fed. R. Civ. P. 56, Local Civil Rule 56.1, and Your Honor's Individual Rule III.C.6, Plaintiff Solid 21, Inc. ("Plaintiff" or "Solid 21") cross-moves for summary judgment on the First Affirmative Defense and all Counterclaims of Defendants Richemont North America, Inc. ("RNA"), Richemont International S.A. ("RSA"), and Montblanc-Simplo GmbH ("Montblanc") (collectively, "Defendants" or "Richemont").  Solid 21 also opposes (with one exception) Defendants' Motion for Summary Judgment.

Solid 21 further provides notice of a recent decision in a pending case in the District of Connecticut involving the same Plaintiff, trademark-at-issue, and similar issues on motions for summary judgment: *Solid 21, Inc. v. Breitling U.S.A., Inc. et al.,* No. 3:19-cv-00514 (MPS), 2021 WL 4430755 (D. Conn. Sept. 27, 2021) (hereinafter "*Solid 21-Breitling*").

## I.    INTRODUCTION

Solid 21 owns and uses the RED GOLD® trademark, which was federally registered in 2003 and covers a class of goods comprising watches and jewelry.  Many of Solid 21's products are featured under its RED GOLD® collection, including high-end luxury watches.  Since registering the mark, Solid 21 has extensively developed and built the RED GOLD® brand into a powerhouse.  Its clientele associate the brand with style, quality, and craftsmanship, and its extensive celebrity association ensures that RED GOLD® products are consistently in demand.

In the 2000's, a number of competing watch sellers took notice of RED GOLD®'s success and incorporated "Red Gold" into the branding for their own products, hoping to cash in on this success.  These copycats included Hublot, Breitling, Ulysse Nardin, and the Richemont defendants here, among others.  In 2011, Solid 21 initiated a series of lawsuits to defend its intellectual property and protect its exclusive rights to use the RED GOLD® brand.  Most of these cases went into hiatus via tolling agreements as the industry waited for Solid 21's case against Hublot to resolve.  That long-running case finally ended in 2018 on the eve of trial.

The instant case is one of those tolled from 2011. In its Motion for Summary Judgment ("Op."), Richemont primarily raises three trademark infringement issues that are ill-suited for resolving as a matter of law: likelihood of confusion, fair use, and genericness of the asserted mark. Indeed, other RED GOLD® cases found such issues to be unresolvable on summary judgment: the Ninth Circuit Court of Appeals found this to be the case in the aforementioned *Hublot* case, and most recently the District of Connecticut found this to be the case in *Solid 21-Breitling*. The same result should apply here.

Solid 21's Cross-Motion for Summary Judgment is premised on Richemont raising a disallowed trademark invalidity argument. RED GOLD® became an incontestable mark in 2009. Incontestability enhances a mark's strength – namely, it precludes an infringer from challenging a mark's validity because it is descriptive, while leaving open the possibility of invalidating a mark because it is generic. Richemont's primary challenge to RED GOLD®'s validity is that "Red Gold" is the common name for alloys of gold and copper used to make watches and jewelry. However, even if Richemont is correct – which it is not – its argument only suggests that "Red Gold" identifies a *characteristic* of the product (the alloy or color) as opposed to the product itself (watches or jewelry). This is a descriptiveness argument, not a genericness one, and is thus precluded by RED GOLD®'s incontestable status.

## II.     STATEMENT OF FACTS

### A.     Solid 21's Incontestable RED GOLD® Trademark

Solid 21 sells luxury watches and jewelry. Plaintiff's Local Civil Rule 56.1 Statement ("S21-56.1") ¶ 4. It began using its RED GOLD® mark in connection with the sale of these products in 1989. *Id.* ¶ 3. The RED GOLD® trademark is a word mark that has been federally registered since 2003 and covers a class of goods that includes watches and jewelry. *Id.* ¶ 1. On June 27, 2009, Solid 21 submitted a declaration of use and incontestability to the Commissioner

for Trademarks.  The declaration described that the mark had been in continuous use in commerce for five years after registration or the date of publication and was still used in commerce.  The U.S. Patent and Trademark Office accepted and acknowledged this declaration. In August 2009, RED GOLD® became incontestable pursuant to 15 U.S.C. § 1065.  *Id.* ¶ 2.

While Solid 21 has used RED GOLD® in commerce since 1989, the early 2000s saw its success reach new heights.  Solid 21 launched an ambitious marketing campaign to expand RED GOLD®'s reach.  Solid 21 aggressively advertised in magazines and television.  It promoted RED GOLD® in runway shows where Solid 21's RED GOLD® jewelry was prominently featured.  And Solid 21 cultivated the power of celebrity association, partnering up with celebrities such as the late Muhammad Ali for RED GOLD® co-promotions and ensuring that famous celebrities such as Naomi Campbell modeled RED GOLD® pieces in runway shows.  *Id.* ¶ 6.  All this contributed to developing RED GOLD® as a strong and successful brand for Solid 21, success which continues to this day.

### B.     RED GOLD® Infringement

RED GOLD®'s shining success in the 2000's gave rise to a number of copycats hoping to cash in on the latest trend.  Watch sellers such as Richemont, Hublot, Breitling, Ulysse Nardin, and others began using "Red Gold" as part of marketing their watches.  In 2011, Solid 21 launched a number of lawsuits against these companies in an effort to prevent the theft of its RED GOLD® brand.  Most of these, including the one against the Richemont defendants, were put on hold via tolling agreements pending the outcome of the *Hublot* case.

The *Hublot* case finally resolved in 2018, after going up to the Ninth Circuit Court of Appeals.  *Solid 21, Inc. v. Hublot of Am.*, 685 F. App'x. 530 (9th Cir. 2017) (hereinafter "*Solid 21-Hublot*").  That court held that summary judgment was unwarranted as Solid 21 raised a triable issue of material fact concerning whether the RED GOLD® mark was generic.  *Id.* at 532.

The parties eventually settled on the eve of trial.  S21-56.1 ¶ 7.  Upon the resolution of the *Hublot* case, a number of lawsuits reappeared as their tolling agreements were keyed to the *Hublot* case, including this one.  Following *Hublot*, a number of watch sellers resolved their differences with Solid 21 and ceased using "Red Gold."  In some instances, watch sellers opted for "pink gold" or "rose gold," and in other instances, they began utilizing their own branded terms.  Hublot changed instances of "red gold" to "rose gold" in or around 2018.  Another of Richemont's competitors, Ulysse Nardin, changed the wording on its watch advertisements to read "rose gold" instead of "red gold," in or around 2011.  Watch seller Jomashop ceased using "Red Gold" as well.  *Id.* ¶ 7.  Richemont followed suit – upon being sued again in 2019 pursuant to the tolling agreement, Richemont relabeled its products that used "Red Gold" and changed them to "pink gold."  Richemont only changed the name or description – the underlying product and its features remained otherwise unchanged.  *Id.* ¶ 8.

That these watch sellers were able to change the labeling for their products to move away from "Red Gold" – while maintaining the same product characteristics -- puts to bed any notion that using "Red Gold" was merely descriptive.  Clearly, there was some strong significance to using "Red Gold" as opposed to the alternative terms these sellers ultimately settled on, marking "Red Gold's" use as clearly a marketing ploy.

These lawsuits fending off trespassers to Solid 21's RED GOLD® brand had a profound impact on its business, taking away prospective customers as well as embroiling Solid 21 in expensive litigation.  S21-56.1 ¶ 9.  While litigation may be a trivial expense to a behemoth such as Richemont, Solid 21 is a much smaller company by comparison and litigation has had an adverse impact on its business.  *Id.*

Today, there are two active RED GOLD® lawsuits: this one and the one against Breitling

in the District of Connecticut. Recently, the court in that case issued a decision denying the parties' motions for summary judgment and finding that a trial was necessary to resolve the disputed issues, including the fair use defense and genericness. *Solid 21-Breitling*, 2021 WL 4430755. Unsurprisingly, that case involves much the same evidence and experts as in this case: Dr. Butters (who has unfortunately since passed but his shoes are being filled by Dr. Finegan), Dr. Ericksen, Ms. O'Steen, Dr. Neal, Mr. Keegan, and Mr. Smith, as relevant here. S21-56.1 ¶ 10.

### III.    SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering this, courts resolve all ambiguities and draw all inferences in favor of the nonmovant in order to determine how a reasonable jury would decide. *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.1992). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82–83 (2d Cir. 2004).

"[S]ummary judgment is generally disfavored in trademark disputes because of the intensely factual nature of trademark disputes." *Cello Holdings, L.L.C. v. Lawrence-Dahl Companies*, 89 F. Supp. 2d 464, 472 (S.D.N.Y. 2000) (quoting *Interstellar Starship Servs., Ltd. v. Epix Inc.*, 184 F.3d 1107, 1109 (9th Cir. 1999)); *see also KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 602 (9th Cir. 2005) ("Because of the intensely factual

nature of trademark disputes, summary judgment is generally disfavored in the trademark arena.").  Accordingly, the issues in dispute in trademark infringement cases (likelihood of confusion, fair use defense, and genericness of the asserted mark) are often ill-suited for disposition at the summary judgment stage.  *See Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 478 (2d Cir. 1996) (summary judgment on the issue of likelihood of confusion is appropriate only "where the undisputed evidence would lead only to one conclusion as to whether confusion is likely"); *EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos*, 228 F.3d 56, 66–67 (2d Cir. 2000) (fair use defense is a highly factual inquiry); *Bristol-Myers Squibb Co. v. McNeil-P.P.C. Inc.*, 973 F.2d 1033, 1039 (2d Cir. 1992) (the question of whether a mark is, or has become, generic is generally one of fact).

## IV.   SOLID 21'S CROSS-MOTION FOR SUMMARY JUDGMENT

Solid 21 cross-moves for summary judgment on Richemont's First Affirmative Defense and all Counterclaims.  The RED GOLD® trademark is incontestable, which narrows the grounds upon which an accused infringer can challenge its validity.  As pertinent here, while an incontestable mark's validity may still be challenged on the ground that it is "generic," it can no longer be challenged on the ground that it is "descriptive."  Richemont's invalidity argument in its First Affirmative Defense and Counterclaims is that the term "Red Gold" is a common term for a type of alloy used in jewelry and watches.  S21-56.1 ¶ 11.  Even were this true – which it is not – all this would do is describe a mark that is "descriptive."  RED GOLD®'s incontestable status precludes this type of challenge.

### A.   Incontestable Status Affords Greater Protection to a Trademark

Trademarks are classified in one of four categories, in descending order of strength: (1) arbitrary, (2) suggestive, (3) descriptive, or (4) generic.  *Star Industries, Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373, 384-85 (2d Cir. 2005).  On one end of this spectrum, arbitrary marks are

considered the strongest because they bear no relation to the product. *Id.* Suggestive marks refer to some characteristic of the product, but require a leap of imagination to get from the mark to the product. *Id.* Descriptive marks identify a characteristic, quality, or ingredient of the product. *Gruner + Jahr USA Pub. v. Meredith Corp.*, 991 F.2d 1072, 1076 (2d. Cir. 1993). Finally, generic marks refer to the genus of which a particular product is a species. *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 194 (1985). Of these four categories, generic marks are the only one that is ineligible for trademark protection. *See Star Industries*, 412 F.3d at 385.

How a mark is categorized also depends on the context. As the Second Circuit explained, the same mark can be categorized differently depending on the product it is used with: the "word 'apple' would be arbitrary when used on personal computers, suggestive when used in 'Apple-A-Day' on vitamin tablets, descriptive when used in 'Tomapple' for combination tomato-apple juice and generic when used on apples." *Bristol-Myers Squibb Co.*, 973 F.2d at 1041 (quoting 1 J.T. McCarthy, Trademarks and Unfair Competition § 11:22, at 498-99 (2d ed. 1984)).

"The Lanham Act provides national protection of trademarks in order to secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers." *Park 'N Fly*, 469 U.S. at 198. Congress concluded that securing the benefits of good reputation to the mark holder would promote competition and the maintenance of product quality. *Id.* Under this Act, the owner of a registered trademark can obtain incontestable status for the mark after five years of continuous use in commerce by filing an affidavit affirming that certain statutory requirements have been met. 15 U.S.C. § 1065. This serves as a means for the mark owner to quiet title in the ownership of the mark and thus encourages him to develop and cultivate the goodwill associated with that mark. *Park 'N Fly*, 469 U.S. at 198.

Incontestability serves to enhance a mark's strength.  *Frehling Enters., Inc. v. Int'l Select Group, Inc.*, 192 F.3d 1330, 1336 (11th Cir. 1989) (citations omitted).  It provides conclusive evidence of the registrant's right to use the trademark and narrows the grounds upon which the trademark's validity may be challenged.  *Gruner + Jahr USA*, 991 F.2d at 1076-77.  As pertinent here, one of the ways in which incontestability narrows these grounds is that it precludes a mark from being challenged on the basis that the mark is descriptive.  *Park 'N Fly*, 469 U.S. at 205; *Gruner + Jahr USA*, 991 F.2d at 1077.  It can still be challenged on the grounds that it is generic. *Park 'N Fly*, 469 U.S. at 195.

The RED GOLD® trademark has been registered since 2003 and achieved incontestable status in 2009.  *See supra* Part II.A.  Thus, this precludes any challenge to RED GOLD®'s validity on the ground that it is descriptive.

**B.    Richemont's Trademark Invalidity Argument is Based on Descriptiveness, Not Genericness**

Richemont's *sole* argument for invalidity of the RED GOLD® mark is that "Red Gold" is the common term for a type of alloy used in jewelry and watches.  S21-56.1 ¶ 11.  Even assuming Richemont is correct – which it is not – all this would mean is that the RED GOLD® mark is descriptive.[1]  Richemont cannot challenge the incontestable RED GOLD® mark based on descriptiveness, and thus it attempts to restyle its "descriptiveness" argument as a "genericness" one instead in order to circumvent the Lanham Act's restrictions on challenging an incontestable mark.

---

[1] On the spectrum of trademark distinctiveness, Solid 21 maintains that the RED GOLD® mark is at least "suggestive" (and not even "descriptive").  *See infra* p. 15.  However, the Court need not determine the distinctiveness of the mark here as Solid 21's present cross-motion assumes *arguendo* that Richemont's contention – that "Red Gold" is a common name for a type of alloy used in watch and jewelry components – is correct.

A descriptive mark conveys a characteristic, quality, ingredient, or component of a product. *See Gruner + Jahr USA*, 991 F.2d at 1076; *Haydon Switch and Instrument, Inc. v. Rexnord, Inc.*, Civ. No. N 86-190(JAC), 1987 WL 26062, at *7-8 (D. Conn. June 4, 1987); s*ee also Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1183 (5th Cir. 1980) (a "descriptive" term identifies a characteristic or quality of an article or service, as, for example, its color, odor, function, dimensions, or ingredients) (internal quotations and citations omitted).  In contrast, a generic term refers to a genus or class of which a product or service belongs; it depicts the product or service as a whole, rather than any particular feature, quality, or characteristic of that produce or service. *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1358 (11th Cir. 2007); *Haydon Switch and Instrument*, 1987 WL 26062, at *7.

Applying these standards to the case at hand, Richemont's invalidity contention clearly falls on the side of descriptiveness.  The RED GOLD® mark is not used to cover (*i.e.*, to identify the source of) gold, a gold alloy, or any alloy as a product for that matter.  It covers a class of goods which includes various types of jewelry, including watches.  S21-56.1 ¶ 1.  Indeed, Solid 21 and Richemont sell watches and jewelry, but neither of them sell gold, gold alloys, or any alloy as a product. *Id.* ¶¶ 4-5.  And Richemont's own witnesses are unequivocal in their belief that "Red Gold" describes a material used in parts of a watch, such as the case or bezel – and *not* a type of watch. *Id.* ¶ 12.  Viewing Richemont's invalidity contention in its most favorable light, all they are arguing is that "Red Gold" is an ingredient (gold alloy) of a component (case, bezel, strap, etc.) of a product (watch).  Accordingly, "Red Gold" cannot depict the product as a whole, but merely an ingredient in one of that product's components.

*Haydon Switch and Instrument, Inc. v. Rexnord, Inc.* illustrates this precisely.  1987 WL 26062, at *7.  In that case, this Court found that the PLANETGEAR mark could not be generic

because it did "not identify a product that is solely a set of planetary gears." *Id.* Rather, the

product itself was a counter, and planetary gears were a component or ingredient of the counter

product. Thus, the PLANETGEAR mark was at most descriptive, and possibly even suggestive.

*Id.* Likewise, in *American Exp. Marketing and Development Corp. v. Black Card LLC*, the court

found BLACKCARD to be descriptive. No. 10 Civ. 1605(DLC), 2011 WL 5825146, at *7-8

(S.D.N.Y. Nov. 17, 2011). Where the product at issue was a credit card, the BLACKCARD

mark conveyed a feature or characteristic of that product – its black color. Along similar lines,

the court in *Black & Decker Corp. v. Dunsford* found that the SNAKELIGHT mark was

descriptive because the mark conveyed a characteristic of the product – that is, a light that was

snake-like. 944 F. Supp. 220, 225 (S.D.N.Y. 1996). And in *Ideal World Marketing, Inc. v.*

*Duracell, Inc.*, the court concluded that the POWERCHECK mark was descriptive because it

conveyed a characteristic of the product – a battery that permitted the consumer to check the

remaining power in the battery. 15 F. Supp. 2d 239, 243-44 (E.D.N.Y. 1998).

These cases elucidate the distinction between a generic term and a descriptive mark. If

the mark at issue were "wristwatch" or "timepiece," Richemont might have a genericness

argument as those might be classes of goods which watches belong to. *See Investacorp, Inc. v.*

*Arabian Inv. Banking Corp.*, 931 F.2d 1519, 1522 (11th Cir. 1991) (teaching that "Milk

Delivery" would be an example of a generic service mark for a milk delivery service, while

"BarnMilk" would instead be descriptive). But that is clearly not the case here. "Red Gold" is

not a type or class of watch. S21-56.1 ¶ 12.

"The defining feature of a descriptive mark is that it gives the consumer an immediate

idea of the contents of the product. *Perfect Pearl Co., Inc. v. Majestic Pearl & Stone, Inc.*, 887

F. Supp. 2d 519, 533 (S.D.N.Y. 2012) (citation omitted). Taking Richemont's contention as

true, that would be all that RED GOLD® does: inform the consumer that the product contains a

certain amount of gold alloy.  A long line of cases say this is at most descriptive, not generic.

*See, e.g.*, *Flag Co., Inc. v. Chan*, 454 F. App'x. 776, 779 (11th Cir. 2011) ("Farming Flags" is at

the very least descriptive because "farming" is a characteristic or quality of the product sold:

flags); *PaperCutter, Inc. v. Fay's Drug Co., Inc.*, 900 F.2d 558, 563 (2d Cir. 1990)

(PAPERCUTTER is descriptive and not generic because it is not the name of the product);

*Henri's Food Prods. Co., Inc. v. Tasty Snacks, Inc.*, 817 F.2d 1303, 1306 (7th Cir. 1987) ("tasty"

not generic as it did not describe a class of salad dressing, but instead described a quality found

in many genuses of salad dressing); *Pfizer Inc. v. Astra Pharmaceutical Prods., Inc.*, 858 F.

Supp. 1305, 1319-20 (S.D.N.Y. 1994) (finding that "XL" is descriptive in a drug name because it

describes the "utility, purpose, function, qualities and characteristics of its product," that is, a

drug with an "extended life" or lasts "extra long"); *Therapy Prods., Inc. v. Bissoon*, 623 F. Supp.

2d 485, 494 (S.D.N.Y. 2009) ("lipolaser" mark is descriptive in the context of a laser used in

lipoplasty and liposuction); *Eagle Snacks, Inc. v. Nabisco Brands, Inc.*, 625 F. Supp. 571, 581-82

(D.N.J. 1985) ("Honey Roast" and "Honey Roasted" were not generic because they described the

characteristics of the product: nuts).

Finally, even if Richemont is correct that "Red Gold" is a generic term for a type of gold

alloy, that would be of no moment because a "term may be generic for one category of goods

and non-generic for another."  *Flag Co.*, 454 F. App'x. at 779.  *In re Seats, Inc.* illustrates this,

where the court found that the SEATS mark could not have been generic because while the "term

'seats' may be generic in relation to chairs or couches or bleachers," it was clearly not generic to

reservation services, which was the category of services under which the mark sought protection.

757 F.2d 274, 277-78 (Fed. Cir. 1985).  Here, the RED GOLD® mark does not seek protection

11

for any type of gold or alloy, but rather for entirely different categories of goods: watches and jewelry.  S21-56.1 ¶ 1.

Solid 21 acknowledges that in the recent *Solid 21-Breitling* decision, the court there denied Solid 21's motion for summary judgment on this same issue.  *Solid 21-Breitling*, 2021 WL 4430755, at *10-11.  In so finding, that court understood Breitling's argument to be that "'Red Gold' is describing a 'genus' of watches or jewelry made of a particular metal alloy principally of gold and copper," *i.e.*, that "Red Gold" is describing a type of watch or jewelry. *Id.* at 10.  But in the record before this case, the undisputed evidence is that Richemont does not understand "Red Gold" to be a type of watch or jewelry, only as a material or color.  Mr. Dubiez and Ms. Zaouk, Richemont's designated corporate witnesses, unequivocally stated that "Red Gold" is a material, but it is *not* a type of watch or jewelry.  S21-56.1 ¶ 12.  This distinguishes it from the record in the *Solid 21-Breitling* case by making clear that "Red Gold" is not the genus of a type of product at issue (watches or jewelry) and thus cannot be generic.

## V.    SOLID 21'S OPPOSITION TO RICHEMONT'S MOTION FOR SUMMARY JUDGMENT

Solid 21 opposes Richemont's Motion for Summary Judgment, with the one exception that it does not oppose dismissing the dilution claim.  Richemont's motion is bound in three fact-intensive inquiries: genericness, fair use, and likelihood of confusion.  Solid 21's voluminous evidence offered to rebut Richemont on all three issues precludes any finding as a matter of law. Richemont's final argument, that Solid 21 must show a likelihood of confusion on the part of a Richemont entity in order to be entitled to intracompany sales as damages, is nonsensical on its face.  Richemont well knows that likelihood of confusion is viewed through the lens of the consumer (which Richemont's affiliated entities certainly are not), but wishes to set up an

impossible standard in order to circumvent this Court's prior ruling that the tolling agreement only applied to certain Richemont entities but not all of them.

### A.    Genuine Issues of Material Fact Abound on the Genericness Inquiry

Richemont acknowledges that Solid 21 has a valid registration for the RED GOLD® trademark and that the mark has achieved incontestable status.  Op. at 11 n.2.  "[M]arks that have been registered with the USPTO are afforded a presumption of validity."  *Am. Ort, Inc. v. Israel*, No. 07-2332, 2007 WL 2049733, at *4 (S.D.N.Y. July 17, 2007).  Thus, the burden shifts to the defendant to prove that the mark is invalid.  *Tiffany & Co. v. Costco Wholesale Corp.*, 994 F. Supp. 2d 474, 480 (S.D.N.Y. 2014) (internal quotation marks and citation omitted).

As an initial matter, Solid 21 has cross-moved for summary judgment on the ground that Richemont's invalidity argument is really one of descriptiveness and not genericness, and that RED GOLD®'s incontestable status precludes a challenger from invalidating it based on descriptiveness.  *See supra* Part IV.  If this Court finds that a reasonable juror could conclude that RED GOLD® falls on the generic side of the trademark distinctiveness spectrum rather than the descriptive side, there is still a triable issue of material fact as to the genericness inquiry.[2]

The question of whether a trademark is generic and thus invalid is a fact-specific analysis that requires courts to consider evidence such as: 1) dictionary definitions, 2) generic use of the term by competitors and others in the trade, 3) plaintiff's own generic use, 4) generic use in the media, and 5) consumer surveys.  *Solid 21-Breitling*, 2021 WL 4430755, at *9 (citations omitted).  A court may also consider purchaser testimony and whether there exist alternative

---

[2] Richemont bizarrely claims that Solid 21 concedes that "Red Gold" is the common term for a type of alloy.  Op. at 11.  This is clearly not the case.  Solid 21's Cross-Motion for Summary Judgment *assumes, for the sake of argument*, that "Red Gold" is a common term for an alloy used in watches and jewelry and that Solid 21 should be entitled to summary judgment even with this assumption.  Solid 21 is at a loss as to how Richemont or its counsel read more into it than that.

terms to describe the product. *Id.* Courts in cases involving other defendants have analyzed these factors with respect to the same RED GOLD® mark at issue here and concluded that the issue of genericness cannot be decided on summary judgment. *Solid 21-Hublot*, 685 F. App'x. at 532 (Ninth Circuit Court of Appeals holding that there was a triable issue of material fact concerning whether RED GOLD® was generic); *Solid 21-Breitling*, 2021 WL WL 4430755, at *9-10 (District of Connecticut holding the same).

As with those previous cases, here Solid 21 puts forth an extensive amount of evidence demonstrating that RED GOLD® is not generic or, at the very least, there is a triable issue of material fact concerning this inquiry.

      1.     RED GOLD®'s Incontestable Status is Strong Evidence of Validity

For a trademark, incontestability is "conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce." 15 U.S.C. § 1115(b). A mark's incontestability serves to enhance its strength. *See Savin Corp. v. Savin Grp.*, 391 F.3d 439, 457 (2d Cir. 2004) ("[A]n incontestible registered trademark enjoys a conclusive presumption of distinctiveness."); *A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC*, 131 F. Supp. 3d 196, 214 (S.D.N.Y. 2015) (a registered trademark that is incontestable "enjoys a conclusive presumption of distinctiveness" and that "once a mark has obtained incontestable status, secondary meaning is conclusively presumed.") (internal quotations and citations omitted). This is true here, where RED GOLD® has been registered for sixteen years and incontestable for ten. *See supra* Part II.A.

      2.     Dictionaries Demonstrate That RED GOLD® is Not Generic

Dr. Edward Finegan, a renowned expert in the field of linguistics, applied accepted scientific linguistics principles in opining on the purported generic usage of "Red Gold" in corpora of American English and other media sources, including dictionaries, magazines, and newspapers.  He concluded that "Red Gold" is at most a linguistically suggestive mark because it merely suggests something about which a piece of jewelry may be made – but not a "generic" term.  Furthermore, he exhaustively researched authoritative American dictionaries and other authoritative sources and found an absence of "red gold" there.  Dr. Finegan found only one family of dictionaries, published by the British enterprise Oxford University Press, to marginally include "red gold" as an entry.  He concluded that it was much more telling that all the other authoritative American dictionaries left out "red gold," and this general absence suggested that it was not common knowledge for it to be a genus of a substance.  S21-56.1 ¶ 13.  This weighs towards a finding of non-genericness.  *See Door Sys. v. Pro-Line Door Sys.*, 83 F.3d 169, 171 (7th Cir. 1996) (absence of challenged mark in dictionaries probative of non-genericness); *Gimix, Inc. v. JS&A Grp.*, 699 F.2d 901, 905–06 (7th Cir. 1983) (crediting absence of term in dictionaries in a finding of non-genericness); *Coca-Cola Co. v. Seven-Up Co.*, 497 F.2d 1351, 1353 (C.C.P.A. 1974) (crediting lexicographer's testimony that THE UNCOLA did not exist in dictionaries).

By contrast, Richemont has not presented any analysis of "Red Gold" by a linguist.  Instead, it relies on Mr. Smith, a goldsmith and jeweler, who overwhelmingly relies on technical dictionaries/texts in the fields of metallurgy and engineering.  Solid 21 strongly disputes the relevancy of such sources because Richemont has not shown these sources are consulted by or reflective of members of the relevant consuming public of watches.  Indeed, Dr. Finegan makes plain the weaknesses of Mr. Smith's report as it presents data from only three general-interest

dictionaries of English, two of which were written and published in the nineteenth century and are of Scottish provenience and dating back to earlier editions beginning in 1867.  In Dr. Finegan's opinion, these dictionaries are thus of no relevance whatsoever to the understanding of "Red Gold" in contemporary American English.  Plaintiff Solid 21, Inc.'s Response to Defendants' Local Rule 56.1 Statement ("PR56") ¶ 5.

Dr. Finegan's research and opinions clearly raise genuine issues of material fact as to how consumers understand and use the term "Red Gold" – and two other courts confirmed as much when facing this very issue.  *See supra* p. 14 (Ninth Circuit and District of Connecticut in the *Hublot* and *Breitling* cases, respectively).

3.     Survey Evidence Demonstrates That RED GOLD® is Not Generic

Dr. Eugene Ericksen conducted a Thermos-style genericness survey, a reliable survey format where respondents are shown a series of stimuli and asked to describe them. S21-56.1 ¶ 14; *Lifeguard Licensing Corp. v. Ann Arbor T-Shirt Co., LLC*, No. 15 CIV. 8459 (LGS), 2017 WL 314272, at *3 (S.D.N.Y. July 24, 2017) (Thermos survey reliable and relevant in a genericness inquiry).  His results contradict those of Dr. Neal and Mr. Keegan, where Dr. Ericksen concluded that "Red Gold" is not a common term to consumers in the watch and jewelry industry.  Further, Dr. Ericksen concluded that "red gold" "cannot be a common or generic term because consumers do not use the term 'red gold' when describing the appearance of or the metals used in the jewelry which has been branded "Red gold."  S21-56.1 ¶ 14.

To the extent their surveys and testimony are admissible,[3] the parties' survey expert opinions and their different results clearly present a genuine issue of material fact that is best left

---

[3] Solid 21 has previously challenged the admissibility of Dr. Neal and Mr. Keegan's opinions and is likely to do the same here.

to the jury. *See Calista Enterprises Ltd. v. Tenza Trading Ltd.*, 43 F.Supp.3d 1099, 1125 (D. Or.

2014) (competing consumer surveys created a "dispute of fact … [such that] the relative weight

of the survey evidence should be evaluated by a factfinder); *Schering Corp. v. Pfizer Inc.*, 189

F.3d 218, 225 (2d Cir. 1999), *as amended on reh'g* Sept. 29, 1999 ("Surveys are, for example,

routinely admitted in trademark and false advertising cases to show actual confusion, genericness

of a name or secondary meaning, all of which depend on establishing that certain associations

have been drawn in the public mind.").

### 4.      Consumer Perception Shows RED GOLD® to be a Brand

Watch and jewelry consumers Dr. Michael Obeng and Lucille Belyayev submitted

declarations and proffered deposition testimony[4] where they stated that they understand RED

GOLD® to be a brand, and not as a metal used in watches and jewelry.  S21-56.1 ¶ 15.  This

supports Solid 21's contention that RED GOLD® is not generic.  *See Self-Realization*

*Fellowship Church v. Ananda Church of Self-Realization*, 59 F.3d 902, 909 (9th Cir. 1995)

(crediting buyers' declarations as relevant to genericness analysis); *Solid 21-Hublot*, 685 F.

App'x at 532 (same).

### 5.      Persons in the Trade View RED GOLD® as a Brand

Duvall O'Steen, an industry expert with more than twenty years of experience in the

jewelry industry and served as Director of Jewelry PR & Promotion for the World Gold Council,

opined that she understands RED GOLD® to be a brand and that "Red Gold" is not a common

name for a type of alloy used in watches and jewelry.  S21-56.1 ¶ 16.  Similarly, Lucille

Belyayev (who is also a consumer) has worked in the watch and jewelry since 1976 and

---

[4] Dr. Obeng and Ms. Belyayev were deposed in other cases; Richemont chose not to depose them here despite having the opportunity to do so.

regularly attends trade shows such as JCK Las Vegas.  She has never understood "Red Gold" to be a color or type of gold used in jewelry and watches, and understands RED GOLD as a brand used to identify Solid 21's products.  *Id.*

Competitors in the industry also support the view that RED GOLD® is a brand.  Upon resolving the *Solid 21-Hublot* case, Solid 21 and Hublot issued a joint press release wherein Hublot recognized the RED GOLD® trademark.  Further, other competitors in the industry (including Ulysse Nardin and Hublot) ceased using "Red Gold."  S21-56.1 ¶ 7.  *See Haynes Intern., Inc. v. Electralloy*, No. CIV. 04-197E, 2009 WL 789918, at *14 (W.D. Pa., Mar. 24, 2009) (finding genuine issues of material fact as a result of third parties correcting their literature recognizing the trademark-in-suit).

### 6.   Availability of Alternative Terms to RED GOLD® Cuts Against Genericness

Watch makers have access to – and have used – other terms besides "Red Gold" in connection with their products.  As discussed above, Breitling's competitor Ulysse Nardin changed the wording in its watch advertisements to read "rose gold" instead of "red gold," in or around 2011.  Another Swiss watch maker, Hublot, also changed instances of "red gold" to "rose gold" in or around 2018, as did Jomashop, a watch retailer.  S21-56.1 ¶ 7.  The availability of alternative terms weighs against genericness because it will still be able to adequately describe its products using these other terms.  *Door Sys.*, 83 F.3d at 171–72 ("automatic garage doors" and "remotely controlled garage doors" served as adequate alternatives to "door systems"); *Q–Tips, Inc. v. Johnson & Johnson*, 108 F. Supp. 845, 863 (D.N.J. 1952) (concluding that "medical swab" and "cotton-tipped applicator" are efficient alternatives for Q–Tips).

### 7.   Solid 21's Extensive Evidence Precludes a Finding of Genericness as a Matter of Law

As is clear above, Solid 21 marshals a voluminous amount of evidence in opposition to Richemont's summary judgment motion.  Thus, even if this Court were to accept Richemont's evidence on genericness -- much of which Solid 21 contends is inadmissible – there are still triable issues of material fact.  *Solid 21-Breitling*, 2021 WL 4430755, at *10 (holding that the conflicting evidence proffered by Solid 21 and Breitling "makes clear that a trial is necessary"); *Solid 21-Hublot*, 685 F. App'x. at 531 (holding that Solid 21's proffered genericness evidence created a triable issue of material fact); *see also Horizon Mills Corp. v. QVC, Inc.*, 161 F. Supp. 2d 208, 219–20 (denying summary judgment where proffered genericness evidence consisted of dozens of examples of the challenged mark's media usage); *Energy Servs. Air Conditioning & Heating Co. v. NICOR, Inc.*, No. 97-C373, 1997 U.S. Dist. LEXIS 20660, at *20–23 (N.D. Ill. Dec. 22, 1997) (denying summary judgement on genericness where evidence included numerous media, trademark registrations, business names, court opinions, statutes, and corporate reports); *McKillip Indus. v. Integrated Label Corp.*, 477 F. Supp. 2d 928, 930–31 (N.D. Ill. 2006) (denying summary judgment in light of genericness evidence that included dictionaries, competitor usage, and media usage of the challenged mark).

### B.     A Likelihood of Confusion Implicates Numerous Disputed Factual Issues

Second Circuit courts apply the eight-factor *Polaroid* test to determine whether there is a likelihood of confusion in trademark infringement cases.  *See Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961).  In applying this test, a court "generally should not treat any single factor as dispositive; nor should the court treat the inquiry as a mechanical process by which the party with the greatest number of factors wins."  *Nat. Organics, Inc. v. Nutraceutical Corp.*, 426 F.3d 576, 578 (2d Cir. 2005).

Summary judgment on the issue of likelihood of confusion is appropriate only "where the undisputed evidence would lead only to one conclusion as to whether confusion is likely."

19

*Cadbury Beverages, Inc.*, 73 F.3d at 478.  The issue is certainly unresolvable on summary judgment where a factual inference must be drawn to arrive at a particular finding on a *Polaroid* factor and a reasonable juror could reach a different conclusion.  *Id.*  Here, with all ambiguities and inferences drawn in favor of Solid 21, a reasonable juror could easily find that a likelihood of confusions arises from Richemont's unauthorized use of the RED GOLD® mark.

       1.    <u>Strength of the mark</u>

With regard to the first *Polaroid* factor, RED GOLD® is undoubtedly a strong mark.  RED GOLD's incontestable status means that it is "presumed to be at least descriptive with secondary meaning, and therefore a relatively strong mark."  *Dieter v. B & H Indus. of Southwest Fla., Inc.*, 880 F.2d 322, 329 (11th Cir. 1989); *see also The Sports Authority, Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 961 (2d Cir. 1996) (a mark's incontestable status is relevant to determining a mark's strength in likelihood of confusion analysis).

Beyond incontestability, other independent indicia further evidence RED GOLD®'s strength as a mark.  Industry expert Ms. O'Steen analyzed Solid 21's usage of RED GOLD throughout the past twenty years, including its usage and exposure in publications, media (including being featured in a rap song), exposure at prestigious fashion shows, media coverage of the RED GOLD® brand, as well as the brand's extensive celebrity clientele (RED GOLD® products being adorned by the likes of Ellen DeGeneres, Will Smith, Geena Davis, Jay Z, and others), along with co-promotions with the late Muhammad Ali.  S21-56.1 ¶ 6.  Her analysis makes clear that RED GOLD® is a strong mark.

RED GOLD® also displays elevated strength on a conceptual level.  On the spectrum of trademark distinctiveness (arbitrary, suggestive, descriptive, generic), linguistics expert Dr. Finegan has opined that RED GOLD® may be suggestive.  S21-56.1 ¶ 13.  In contrast,

Richemont's contention that RED GOLD® is a conceptually weak mark because it is a generic name for a gold alloy is based on what is likely *the* most disputed fact in this entire litigation – that "Red Gold" is a common term for a type of alloy used in watches and jewelry.  *See* Op. at 13.

Finally, Richemont resorts to cherry-picking deposition statements made by a survey expert, Dr. Ericksen, in trying to insinuate that the market for RED GOLD products is small.  Op. at 14.  Initially, Dr. Ericksen has not been proffered as an expert on the watch and jewelry industry or market.  S21-56.1 ¶ 14.  But more to the point, it is no secret that the market for such rarefied products is not large.  One would not imagine Richemont sells nearly as many Baume & Mercier watches as McDonald's sells burgers.  After all, there are only so many people who can afford a $30,000 watch, and even fewer who can consider buying the $250,000 ones that exceed the cost of many homes in the U.S.[5]  Richemont's reliance on Dr. Ericksen's cherry-picked testimony on this issue is unsupported, taken out of context, and dwarfed by the fulsome analysis of an actual expert on the relevant industry – Ms. O'Steen.

### 2.    Similarity of products and bridging the gap

Richemont does not seriously dispute that Solid 21 and Richemont compete in the same market or that there is any bridge to gap between their products, as they readily concede that the parties all sell luxury watch and jewelry products.  Op. at 18; *see also* S21-56.1 ¶¶ 17-18.  Rather, Richemont attempts to create a divide in the parties' respective markets by claiming that Solid 21 focuses on the "bling" market whereas Richemont does not.  *Id.*  But this distinction (to the extent one exists as Richemont puts forth at best a vague definition of "bling") is based solely on the self-serving statements of Richemont's employee witnesses Mr. Dubiez and Ms. Zaouk.

---

[5] New York City excepted.

On the other hand, Solid 21's industry expert witness, Ms. O'Steen, opined that Solid 21 and Richemont's products *directly compete* with each other.  Their products are sold at similar price points, both with watch products often ranging into the tens of thousands (and sometimes more) of dollars.  Both advertise to watch collectors in luxury watch publications, such as Watch Time and International Watch.  Both sell online, either directly to consumers or through third party vendors.  Indeed, Ms. O'Steen opined that the specific geographic location of the sellers is irrelevant in this type of rarefied market where the products are pricey and sold in limited quantities.  S21-56.1 ¶ 17.  And the parties' target similar consumer demographics: essentially high net-worth individuals who can afford their products.  S21-56.1 ¶ 18.  This factor clearly weighs towards a likelihood of confusion.

### 3.    Similarity of the marks

Richemont does not seriously dispute that they used the exact words "Red Gold" in their promotional materials.  *RVC Floor Décor, Ltd. v. Floor and Décor Outlets of Am., Inc.*, 2:18-cv-6449 (DRH) (ARL), 2021 WL 1163117, at *10 (E.D.N.Y. Mar. 18, 2021) (citing *Reply All Corp. v. Gimlet Media, LLC*, 843 F. App'x. 392, 396 (2d Cir. 2021) (using two identical words in sequence to form a mark is highly unusual and weighs toward confusion).  In fact, all they do is create *more* issues of disputed fact, rendering this completely inappropriate for summary judgment resolution.

First, Richemont's claim that RED GOLD® "invariably appeared in lower-case letters …" is entirely unsupported and appears based on reviewing its own cherry-picked sample of advertisements.  In fact, this characterization is inconsistent with the advertisements that this Court evaluated in Richemont's motion to dismiss, where the Court observed that the term "Red Gold" appears in an identical font and size as the product's brand name.  Dkt. No. 91 at 12.  It is

also inconsistent with the advertisements that industry expert Ms. O'Steen reviewed in which "Red Gold" was one of the largest, if not *the* most prominent, term featured in the ad. S21-56.1 ¶ 19. With regard to Richemont's placement of "Red Gold" alongside its own brand names, this Court has opined that the use of "Red Gold" in product headings, even in these situations, can be understood to create an association with the "Red Gold" brand. Dkt. No. 91 at 12.

Further, Richemont's claim that it only used "Red Gold" in relation to products made from what it considers the alloy "Red Gold" is contradicted by its own behavior. As discussed, in 2019 Richemont simply changed all its names and descriptions of products using the term "Red Gold" to use the term "pink gold," despite changing nothing else about the products or their characteristics. *See supra* Part II.B. This means that Richemont is perfectly content selling products labeled as "pink gold" despite this label being inaccurate. In view of this, there is no reason to believe that Richemont has any concern about accurately labeling its products when they are labeled as "Red Gold."

4.     Good or bad faith in adopting the mark

The decision to change the labeling of Richemont's products from "Red Gold" to "pink gold" despite there being no change to the underlying products is strong evidence of bad faith towards *someone*: either 1) to consumers who are misled into what they are buying (whether they were expecting to purchase a "Red Gold" product and received something else, or were expecting to purchase a "pink gold" product and received something else); or 2) to Solid 21 because the pre-2019 label of "Red Gold" on Richemont's products was arbitrary and had no relation to any feature or characteristic of the underlying product. For instance, the availability of other descriptive terms and a decision not to use them is evidence suggesting a lack of good

faith.  *EMI Catalogue P'ship*, 228 F.3d at 67 (defendants' decision to use the phrase "Swing Swing Swing" when other phrases were available evidenced lack of good faith).

Additionally, where a defendant had actual or constructive knowledge of a mark and chose to adopt it, that also evidences a lack of good faith.  *Solid 21-Breitling*, 2021 WL 4430755, at *12.  Here, Richemont admits that they knew of the RED GOLD® mark since at least 2011 when they were initially sued over this same mark.  S21-56.1 ¶ 21.  The fact that they continued to use it until 2019 indicates an intent to trade on the goodwill of the mark and preclude any finding of good faith on Richemont's part as a matter of law.  *EMI Catalogue P'ship*, 228 F.3d at 68 ("Because the [good faith] issue goes to defendants' intent, it 'is best left in the hands of the trier of fact.'") (quoting *Sports Auth., Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 964 (2d Cir. 1996)).

       5.       <u>Sophistication of buyers and degree of care</u>

Solid 21's industry expert, Ms. O'Steen, opined that there is a variation in the degree of care exercised by prospective purchasers in this market – a small and exclusive group of affluent consumers with high net worth.  While a $30,000 watch may be a significant purchase to the average consumer, the target consumer for these products is anything but average – the people with enough disposable income to afford such purchases are more colloquially known as the "1%'ers."  They are affluent enough that the cost of such a purchase is insignificant to them and they tend not to exercise a great deal of care when purchasing because they are typically more interested in buying into the "cachet" that surrounds a successful brand.  S21-56.1 ¶ 20.

       6.       <u>Actual confusion</u>

While Solid 21 has proffered witnesses who will testify at trial as to the issue of confusion, a plaintiff need not show actual confusion to prevail.  *Arrow Fastener Co., Inc. v.*

*Stanley Works*, 59 F.3d 384, 397 (2d. Cir. 1995); *Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 78 (2d. Cir. 1988); *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 875 (2d. Cir. 1986).

> 7.   Balancing the *Polaroid* factors

Richemont can prevail *only* where there is no way for the factfinder to find a likelihood of confusion based on the undisputed evidence.  *See Cadbury Beverages, Inc.*, 73 F.3d at 478. Here, not only is so much of the evidence disputed, most of the *Polaroid* factors weigh in favor of a likelihood of confusion.  This entirely precludes a finding in Richemont's favor on summary judgment.

## C.   Richemont Cannot Prove All Fair Use Elements as a Matter of Law

Richemont's attempt to re-raise the fair use issue that this Court previously addressed on its motion to dismiss is misguided.  *See* Dkt. No. 91 at 10-15 (this Court's prior ruling on fair use).  The differing procedural posture has not given rise to ruling on this issue as a matter of law; rather, the additional facts developed through discovery have *confirmed* many of the factors that this Court relied on in denying Richemont's fair use defense that were previously merely allegations in the complaint.  Further, the court in the pending *Solid 21-Breitling* case recently denied the defendants' assertion of fair use in that case on facts nearly identical to those here. *Solid 21-Breitling*, 2021 WL 4430755, at *11-12.

The Second Circuit has cautioned that due to the "fact-driven nature of the fair use determination," courts should be cautious in finding fair use as a matter of law on a motion for summary judgment.  *See Wright v. Warner Books, Inc.*, 953 F.2d 731, 735 (2d Cir 1991).  In order to avail itself of the fair use defense to infringement, a "defendant must prove three elements: that the use was made (1) other than as a mark, (2) in a descriptive sense, and (3) in good faith."  *Solid 21-Breitling*, 2021 WL 4430755, at *11 (quoting *Kelly-Brown v. Winfrey*, 717

F.3d 295, 308 (2d. Cir. 2013)).  Richemont once again cannot prevail on all three fair use

elements as a matter of law.

       1.     Use in a descriptive sense

Discovery has unequivocally revealed that Richemont's use of the RED GOLD® mark

was anything but descriptive.  In considering whether a defendant's use was descriptive, a court

may consider whether there exist other terms available to describe the pertinent characteristic.

*EMI Catalogue P'ship*, 228 F.3d at 65.  Here, not only did Richemont have other terms available

to use (such as "pink gold" or "rose gold") they actually did use them (eventually).  In 2019,

Richemont changed all of its uses of "Red Gold" to "pink gold" – despite not changing a single

feature about the underlying product itself.  *See supra* Part II.B.  This is consistent with other

watch seller defendants, such as Ulysse Nardin and Hublot, who were sued over their

unauthorized use of the RED GOLD mark and subsequently changed their product descriptions

to use "rose gold" or "pink gold" in lieu of "Red Gold."  *See id.*  A reasonable conclusion can be

drawn that Richemont never needed to use the phrase "Red Gold" in the first instance and

wished to exploit the success of the RED GOLD® brand by association, making such use non-

descriptive.  *See EMI Catalogue P'ship*, 228 F.3d at 65-66 (material issue of fact existed for

descriptiveness where defendants had alternate ways to identify the goods or action); *Solid 21-*

*Breitling*, 2021 WL 4430755, at *11 (material issue of fact for descriptiveness existed where

"rose gold" existed as an alternative to "Red Gold").

       2.     Use other than as a mark

In re-raising its fair use defense, Richemont adds nothing that was not already addressed

in its motion to dismiss.  Initially, Richemont's claim that they used RED GOLD® only in

connection with products that contained a "Red Gold" alloy itself raises disputed questions of

fact.  *See* Op. at 20-21.  Solid 21 has offered voluminous evidence demonstrating that "Red

Gold" is not an alloy nor the common term for such, so this is at best a disputed fact.  *See supra*

Part V.A.  Further, Richemont's claim that they used "Red Gold" in promotional materials along

with their own brand names was already addressed by this Court previously.  Dkt. No. 91 at 11-

12.  Even were this the case, that the term "Red Gold" was used in product headings, and often in

font size and type as Richemont's own brand names, gives rise to a reasonable inference that

they intended to create an association with Solid 21's brand and thus using the term as a mark.

And even where the term "Red Gold" was used in both product descriptions and headings, this

Court found that placing the term "Red Gold" in headings indicated that the term was significant

enough to include there.  Dkt. No. 91 at 12.  Indeed, this would have an especially significant

impact on the typical consumer for this type of product, which Solid 21 has established as

affluent and often exercising a lesser degree of care before purchasing.  S21-56.1 ¶ 20.

Further, Richemont's extensive infringing use through an extended period of time belies

any suggestion that this use was for anything other than as a mark.  This Court previously

explained that the broader context of a defendant's use can be significant insofar as their

repetitive overuse of another's trademark may not be a fair use.  *See* Dkt. No. 91 at 11 (citing

*Cosmetically Sealed Indus., Inc. v. Chesebrough-Pond's USA Co.*, 125 F.3d 28, 31 (2d Cir.

1997) *and* 2 McCarthy on Trademarks and Unfair Competition § 11:48.50 (5th ed. 2020)).

Accordingly, this Court found the complaint's allegations of multiple infringing uses lead to "an

inference that these uses were repetitive for the purpose of creating an association with Plaintiff's

brand."  Dkt. No. 91 at 12.

With the factual record developed since then, those multiple infringing uses are no longer

allegations in a complaint.  During discovery, Richemont identified and produced more than

*seven thousand pages* of marketing material where they used the RED GOLD® mark.  S21-56.1

¶ 22.  This is far greater than the eleven examples identified in the complaint, indicating that any

unauthorized use was clearly indicative of a protracted, persistent, and consistent attempt to build

an association between Richemont and the RED GOLD® mark and negating any fair use.  *See*

*Kelly-Brown*, 717 F.3d at 309 ("Courts are more likely to treat recurring themes or devices as

entitled to protection as a mark, even where a single iteration might not enjoy such protection.").

3.    <u>Use made in good or bad faith</u>

Despite bearing the burden to prove all three elements of the fair use defense as a matter

of law, Richemont entirely ignores addressing the good faith element in its brief.  This is

unsurprising, as there are numerous indicia of a lack of good faith on their part.  For instance, the

availability of other descriptive terms and a decision not to use them is evidence suggesting a

lack of good faith.  *EMI Catalogue P'ship*, 228 F.3d at 67 (defendants' decision to use the phrase

"Swing Swing Swing" when other phrases were available evidenced lack of good faith).  As

discussed above, Richemont had other terms such as "pink gold" or "rose gold" readily available

and chose not to use them.  Further, where a defendant had actual or constructive knowledge of a

mark and chose to adopt it, that also evidences a lack of good faith.  *Solid 21-Breitling*, 2021 WL

4430755, at *12.  Here, Richemont admits that they knew of the RED GOLD® mark since at

least 2011 when they were initially sued over this same mark.  S21-56.1 ¶ 21.  The fact that they

continued to use it until 2019 indicates an intent to trade on the goodwill of the mark.  These

preclude any finding of good faith on Richemont's part as a matter of law.  *EMI Catalogue*

*P'ship*, 228 F.3d at 68 ("Because the [good faith] issue goes to defendants' intent, it 'is best left

in the hands of the trier of fact.'") (quoting *Sports Auth., Inc. v. Prime Hospitality Corp.*, 89 F.3d

28

955, 964 (2d Cir. 1996)); *see also Cadbury Beverages, Inc.*, 73 F.3d at 483 (subjective issues such as good faith are ill-suited for determination as a matter of law.).

    **D.**    **There is No Basis for Exempting Richemont's Intracompany Sales From Damages**

Richemont's naked attempt at avoiding liability is based on a strawman argument: that Solid 21 must show a likelihood of confusion from Richemont's North American (RNA) entity when it purchases products to distribute in the U.S. from its European entities. *See* Op. at 22. This is a nonsensical standard – of course RNA will not be confused when it purchases products from its affiliated European entities. But the relevant likelihood of confusion analysis is from the end consumer, not between affiliated entities. *Spectrum Vision Sys., Inc. v. Spectera, Inc.*, 35 F. Supp. 2d 797, 804-05 (D. Kan. 1998) (likelihood of confusion "must be based on the confusion of some relevant person, i.e., a customer or purchaser"). It is clear that the intracompany sales occur because RNA distributes Richemont products sent to it by the European entities to the U.S., not because RNA is the end purchaser. S21-56.1 ¶ 23.

Rather than cite any case to support its outlandish proposition, Richemont resorts to playing the victim card in claiming that Solid 21 is attempting to avoid the tolling agreement. Op. at 23. However, this is really just Richemont attempting to re-litigate this Court's decision on what parties are covered by the tolling agreement in its motion to dismiss. This Court has already held that certain of the defendants were not parties to the tolling agreement and thus fail to benefit from the agreement's immunity provision. *See* Dkt. No. 91 at 6-8. As an undoubtedly sophisticated entity, Richemont should have understood who they needed to include in the tolling agreement before they drafted it. And if the parties were insufficiently covered, they could also have contacted Solid 21 and sought an amendment. There is no indication this was ever done, and this Court should reject this second attempt at reopening a decided issue.

## VI.   CONCLUSION

For the foregoing reasons, Solid 21 respectfully requests the Court grant its Cross-Motion for Summary Judgment, and deny Richemont's Motion for Summary Judgment as to all issues except the dilution claim.

Dated: October 7, 2021

        _/s/ David L. Hecht_
David L. Hecht
Hecht Partners LLP
125 Park Avenue, 25th Floor
New York, NY 10017
P: (212) 851-6821
dhecht@hechtpartners.com

*Counsel for Plaintiff Solid 21, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I, David L. Hecht, hereby certify that on October 7, 2021, I served a true and correct copy of the foregoing **PLAINTIFF SOLID 21, INC.'S CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** to counsel of record via electronic filing.

*/s/ David L. Hecht*
David L. Hecht
