UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------- X
                                               :
SOLID 21, INC.,                                :
                              Plaintiff,       :
                                               :          19 Civ. 1262 (LGS)
           -against-                           :
                                               :       __AMENDED OPINION__
RICHEMONT NORTH AMERICA, INC.,                 :          __AND ORDER__
et al.,                                        :
                              Defendants.      :
------------------------------------------------------- X
```

LORNA G. SCHOFIELD, District Judge:

      The Opinion and Order on the parties' cross-motions for summary judgment was entered on September 7, 2022 (Dkt. No. 159). This Amended Opinion and Order corrects citation errors and supersedes the original Opinion and Order. These corrections do not modify the analysis or conclusion of the original Opinion and Order.

      Plaintiff Solid 21, Inc. brings this action alleging trademark infringement of its RED GOLD mark used on Plaintiff's watch and jewelry products. After the motion to dismiss, the remaining Defendants are Richemont North America, Inc. ("RNA"), Richemont International S.A. ("RISA"), and Montblanc-Simplo GmbH. Plaintiff's surviving claims are direct and contributory trademark infringement, unfair competition, trademark dilution and false description under the Lanham Act, and related claims under New York law, namely common law trademark infringement and dilution under N.Y. Gen. Bus. Law ("NY GBL") § 360-l. Defendants assert two counterclaims, for invalidity of Plaintiff's mark, and cancellation of Plaintiff's mark. The parties cross-move for summary judgment. For the reasons stated below, Defendants' motion is granted in part and denied in part, and Plaintiff's motion is denied.

## I.     BACKGROUND

### A.     Overview

Unless otherwise stated, the following facts are undisputed and drawn from the parties' submissions, including their Local Civil Rule 56.1 statements.

Plaintiff sells luxury watches and jewelry.  The Defendants' brands at issue -- MONTBLANC, BAUME & MERCIER and IWC -- are Swiss watch and jewelry companies owned by Richemont Group.  In 2003, Plaintiff registered its RED GOLD trademark.  *See* U.S. Trademark Reg. No. 2,793,987.  Plaintiff asserts the mark became incontestable in August 2009 pursuant to 15 U.S.C. § 1065.  Since then, Plaintiff has sued many watch and jewelry companies over the use of the term "red gold."

The parties vigorously dispute the manner in which Defendants use the term "red gold." Defendants proffer evidence that they use the term only in connection with products made, at least in part, from "red gold alloy conforming to ISO Standard 8654."  Plaintiff also has proffered evidence that the term "red gold" is "not used as a common term to identify any sort of alloy."

### B.     Expert Reports

The parties rely on a series of expert reports to evaluate the strength of the RED GOLD mark and the likelihood of confusion between Defendants' products and Plaintiff's mark.

Defendants rely on the report of Gary L. Smith, a master goldsmith, who opined that "red gold" has been used to refer generically to high copper content gold for over 150 years. Defendants also rely on the report of Dr. David T. Neal, who tested consumer perception of the term "red gold" and concluded that sixty-seven percent of participants "indicated that RED GOLD is a common name," seventeen percent had no opinion or did not know, and sixteen

percent "indicated that RED GOLD is a brand name."  Plaintiff argues that Dr. Neal's survey is rebutted by the work of its own expert, discussed below.  Defendants' third expert, Mark Keegan, designed and executed a study of 686 current and prospective luxury watch purchasers to measure consumer perception of "red gold" and concluded that "[r]elevant consumers do not identify 'red gold' as a brand when it appears in advertisements for Richemont luxury watches."

Plaintiff relies on its own linguistics expert, Dr. Edward Finegan, who opined that the term "red gold" is not found in almost all authoritative English dictionaries.  Plaintiff also proffers Dr. Eugene Ericksen to rebut Defendants' survey experts.  Dr. Ericksen concluded that "'red gold' is not a term that is common or familiar to consumers in the jewelry and watch industry."  Plaintiff's final expert, Duvall O'Steen, opined that she understands RED GOLD to be a brand and that "red gold" is not a common name for a type of alloy used in watches and jewelry.

## II.   STANDARD

Summary judgment is proper where the record establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Electra v. 59 Murray Enters., Inc.*, 987 F.3d 233, 248 (2d Cir. 2021).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Liberty Lobby*, 477 U.S. at 248; *accord Saleem v. Corp. Transp. Grp.*, 854 F.3d 131, 148 (2d Cir. 2017).

Courts must construe the evidence and draw all reasonable inferences in the non-moving party's favor.  *Electra*, 987 F.3d at 248.  When evaluating cross-motions for summary judgment,

the Court reviews each party's motion on its own merits and draws all reasonable inferences against the party whose motion is under consideration. *Schwebel v. Crandall*, 967 F.3d 96, 102 (2d Cir. 2020). When the movant properly supports its motion with evidentiary materials, the opposing party must establish a genuine issue of fact by citing particular parts of materials in the record. Fed. R. Civ. P. 56(c)(1)(A).

## III.  DISCUSSION

Defendants move for summary judgment on (1) Plaintiff's trademark infringement and unfair competition claims; (2) Defendants' third affirmative defense of fair use and (3) Defendants' counterclaims for trademark invalidation on the ground of genericness. Defendants also seek to exclude their intracompany sales as a basis for liability. Plaintiff cross-moves for summary judgment on Defendants' counterclaims and its first affirmative defense, which all assert trademark invalidity on the ground of genericness. Plaintiff does not oppose dismissal of the dilution claim, which is dismissed. For the reasons below, Defendants' motion is granted as to intracompany sales, and the parties' motions are otherwise denied.

### A.     Trademark/Unfair Competition

To prove trademark infringement under the Lanham Act, a plaintiff must demonstrate that "(1) it has a valid mark that is entitled to protection and that (2) the defendant's actions are likely to cause confusion with that mark." *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 84 (2d Cir. 2020) (internal quotations and alterations omitted). The parties dispute both the validity of Plaintiff's RED GOLD mark and whether the marketing of Defendants' products is likely to cause confusion with that mark.

1.        **Validity of Mark**

The Lanham Act treats trademark registration as "prima facie evidence of the validity of the registered mark." 15 U.S.C. § 1115(a).  "A registered mark becomes incontestable if it has been in continuous use for five consecutive years subsequent to its registration and is still in use." *Gruner + Jahr USA Pub., a Div. of Gruner + Jahr Printing & Pub. Co. v. Meredith Corp.*, 991 F.2d 1072, 1076 (2d Cir. 1993); *see also* 15 U.S.C. § 1065.  Incontestability serves as "conclusive evidence of the validity of the registered mark," 15 U.S.C. § 1115(b), and narrows the grounds upon which the trademark's validity may be challenged, *Gruner + Jahr USA*, 991 F.2d at 1076-77.  Even a statutorily incontestable mark can be rendered invalid and cancelled if it has become "the generic name for the goods or services, or a portion thereof, for which it is registered."  15 U.S.C. § 1064(3); *accord Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 194 (1985).

Marks are classified, in ascending order of strength, as (1) generic; (2) descriptive; (3) suggestive and (4) arbitrary or fanciful.  *RiseandShine Corp. v. PepsiCo, Inc.*, 41 F.4th 112, 120 (2d Cir. 2022).  "A generic mark is a common name, such as automobile or aspirin, that identifies a kind of product."  *Id.*  Generic marks receive "no protection from the law of trademark, even if the mark has acquired public recognition as identifying the source of the product."  *Id.* (citing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976)).  This is because "[n]either prior use, nor public recognition as a source identifier can justify denying others the right to refer to their product as what it is."  *Id.* at 121.

The question of whether a mark is, or has become, generic is generally one of fact. *Bristol-Myers Squibb Co. v. McNeil-P.P.C. Inc.*, 973 F.2d 1033, 1039-40 (2d Cir. 1992).  "The '[t]ypes of evidence to be considered in determining whether a mark is generic include:

(1) dictionary definitions; (2) generic use of the term by competitors and other persons in the

trade; (3) plaintiff's own generic use; (4) generic use in the media; and (5) consumer surveys.'"

*Tiffany & Co. v. Costco Wholesale Corp.*, 994 F. Supp. 2d 474, 482 (S.D.N.Y. 2014), *aff'd* 971

F.3d 74 (2d Cir. 2020); *see also In re Reed Elsevier Props. Inc.*, 482 F.3d 1376, 1378 (Fed. Cir.

2007) (a party may seek to demonstrate the public's understanding of a term through other

evidence, including "purchaser testimony, consumer surveys, dictionary definitions, trade

journals, newspapers, and other publications").  Courts may also consider whether there are any

alternative terms to describe the product because the lack of a "commonly used alternative [that]

effectively communicates the same functional information" suggests that the term at issue is

generic.  *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 145 (2d Cir. 1997) (quoting

*A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 306 (3d Cir. 1986)).

### a.     Defendants' Motion

Defendants argue that they have proffered sufficient evidence to prove as a matter of law

that Plaintiff's RED GOLD mark is invalid because it is generic.  This argument underpins

Defendants' motion for summary judgment on Plaintiff's infringement claim, as well as on

Defendants' invalidity counterclaims.

Defendants rely on reports from three experts, Mr. Smith (the "Smith Report"), Dr. Neal

and Mr. Keegan.  The Smith Report cites encyclopedias, dictionaries and textbooks describing

red gold as a metal alloy as early as 1861, as well as "extensive" use of the term "red gold" in the

jewelry and watch industry as early as 1872.  The Smith Report also explains the results of a

metallurgical test performed on a pendant from Plaintiff's RED GOLD collection, which

"confirm[ed] that the pendant is fabricated from generic red gold alloy" with a chemical

composition matching "a type of common formula for red gold that has been used for hundreds

of years throughout the world . . . fall[ing] between the 5N (red gold) and 6N (dark red gold) color designations in the ISO Standard 8654." Defendants also proffer evidence of Plaintiff's using the term "red gold" to describe its jewelry. For example, Defendants point to deposition testimony from Plaintiff admitting that Plaintiff uses the term "red gold" with products that are made, at least in part, from the alloy red gold, stating that any product sold in its RED GOLD collection "has to have some amount of amber hued gold in it."

Defendants also rely on Dr. Neal's "Teflon" survey testing consumer perception of the term "red gold." *See* McCarthy on Trademarks & Unfair Competition § 12:16 (5th ed. 2021) ("The most widely used survey format to resolve a genericness challenge is the 'Teflon' format."). Dr. Neal's survey showed that sixty-seven percent of respondents believe "red gold" to be a common name rather than a brand name, with only sixteen percent indicating a belief that "red gold" is a brand name, and seventeen percent indicating they did not know whether "red gold" is a common name or a brand name or had no opinion. Defendants' third expert, Mark Keegan, opined that "[r]elevant consumers do not identify 'red gold' as a brand when it appears in advertisements for [Defendants'] luxury watches" and "[w]hen discussing luxury watch attributes and materials in their own words, consumers do not use the term red gold as a brand name."

Plaintiff vigorously disputes these findings by offering its own team of experts. Dr. Edward Finegan, Plaintiff's linguistic expert, opines that "red gold" is not a generic term for consumers in the watch and jewelry market and cites evidence that "red gold" is not found in any "authoritative American dictionaries" except for the New Oxford American Dictionary. Plaintiff also disputes the relevance to the issue of consumer perception of the texts on which Defendants rely. Plaintiff relies on Dr. Eugene Ericksen's Thermos-style genericness survey to contradict

Dr. Neal's and Mr. Keegan's findings.  Dr. Ericksen concludes that "red gold" is not a common term to consumers in the watch and jewelry industry.  In addition, Plaintiff proffers declarations from consumers and those in the watch and jewelry industry who understand "red gold" to be a brand rather than a generic term.

Based on the current record, the issue of genericness cannot be resolved at summary judgment.  The record contains conflicting expert opinions as well as conflicting evidence from media publications, dictionaries, other texts and consumers of jewelry regarding the perception of the term "red gold."  Accordingly, Defendants' motion for summary judgment on the trademark claim on the ground of genericness is denied, and their motion for summary judgment on the counterclaims is denied.  *See Solid 21, Inc. v. Hublot of Am.*, 685 F. App'x 530, 532 (9th Cir. 2017) ("Solid 21 raised a triable issue of material fact concerning whether consumers understand 'red gold' to refer only to a particular producer's goods (in which case the term is not generic) or whether consumers understand the term to refer to the goods themselves (in which case the term is generic)."); *Solid 21, Inc. v. Breitling U.S.A., Inc.*, No. 3:19-cv-00514, 2021 WL 4430755, at *10 (D. Conn. Sept. 27, 2021), *order vacated in part on reconsideration on other grounds,* 2021 WL 5868173 (D. Conn. Dec. 10, 2021), *reconsideration denied,* 2022 WL 204550 (D. Conn. Jan. 24, 2022) (concluding that issues of fact precluded summary judgment as to the genericness of Plaintiff's RED GOLD mark where the parties had submitted nearly identical expert evidence).

### b.    Plaintiff's Motion

Plaintiff cross-moves for summary judgment on Defendants' counterclaims and first affirmative defense, which all challenge the validity of Plaintiff's mark on the ground that it is generic.  Plaintiff argues that Defendants' invalidity challenge fails as a matter of law, because it

is based on the assertion that "red gold" is a common term for a type of alloy or a color, and consequently the mark is "descriptive" rather than "generic." While a generic mark is per se invalid, a descriptive mark is not. *See Gruner*, 991 F.2d at 1077 (stating that, in an infringement case involving an incontestable mark, a defendant "may not succeed in a defense that declares the mark is entitled to no protection because it is descriptive").

Defendants' focus on the material or ingredients in the jewelry does not necessarily mean Plaintiff's mark is descriptive. *Solid 21*, 2021 WL 4430755, at *10 (denying Plaintiff's motion for summary judgment where the defendant also challenged Plaintiff's RED GOLD mark). "The lines of demarcation" between categories of marks -- such as generic and descriptive -- "are not always bright," and "a term that is in one category for a particular product may be in quite a different one for another." *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976); *cf. RiseandShine*, 41 F.4th at 121 ("Because suggestive marks, by their nature, seek to suggest the qualities of the product, it can be difficult to distinguish weak suggestive marks from descriptive ones.").

Many courts -- including the Second Circuit -- have found that a term that identifies a key feature, quality or characteristic of the product or service at issue can be generic. *See, e.g.*, *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 146 (2d Cir. 1997) ("[A]lthough 'Honey Brown' is clearly descriptive of [plaintiff's] product . . . it still might, of necessity, signify a generic category (or subcategory) of beer."); *Abercrombie*, 537 F.2d at 8 (concluding that the term "safari" is generic for certain clothing); *In re Wickerware, Inc.*, 227 U.S.P.Q. 970, 971 (T.T.A.B. Nov. 8, 1985) (finding that "'wickerware' is the generic name of the products made of wicker"). As discussed above, genericness is a question of fact, and in this case, substantial conflicting evidence precludes summary judgement on the issue. Accordingly,

Defendants' motion does not fail as a matter of law, and Plaintiff's motion for summary

judgment -- which raises solely this issue -- is denied in its entirety.

### B.      Likelihood of Confusion

Defendants' motion for summary judgment on the trademark infringement claim is

denied for the additional reason that a reasonable jury could find that Defendants' use of the term

"red gold" is likely to cause consumer confusion with Plaintiff's registered mark.  To evaluate

claims of consumer confusion, courts in the Second Circuit balance the eight factors set out in

*Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir. 1961).  *RiseandShine*, 41

F.4th at 119.  They are:  "[t]he strength of [the plaintiff's] mark, the degree of similarity between

the two marks, the proximity of the products, the likelihood that the [plaintiff] will bridge the

gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the

quality of defendant's product, and the sophistication of the buyers."  *Id.*  Six of these factors

directly relate to the likelihood of confusion; the other two -- good faith and the quality of

defendant's products -- are more pertinent to other issues.

### 1.      Strength of the Mark (Factor 1)

The first factor is strength of the mark.  The parties' arguments regarding the strength of

the mark mirror their arguments regarding the validity of the mark.  "[T]he strength of a mark

depends ultimately on its distinctiveness, or its 'origin-indicating' quality, in the eyes of the

purchasing public."  *RiseandShine*, 41 F.4th at 120.  "The strength of a trademark is assessed

based on either or both of two components: (1) the degree to which it is inherently distinctive;

and (2) the degree to which it has achieved public recognition in the marketplace, sometimes

called acquired strength."  *Id.* (citing *W.W.W. Pharm. Co., Inc. v. Gillette Co.*, 984 F.2d 567, 572

(2d Cir. 1993)).  As discussed above, inherent distinctiveness is assessed using four categories of

marks that indicate increasing distinctiveness and protectability: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. *See id.*

The same conflicting evidence that raises a question of fact about the validity of the mark, raises a question about the strength of the mark. *See Tiffany & Co.*, 971 F.3d at 86 ("As in any other area of law, then, '[i]f a factual inference must be drawn to arrive at a particular finding on a *Polaroid* factor, and if a reasonable trier of fact could reach a different conclusion, the district court may not properly resolve that issue on summary judgment.'").

Assuming that the issue of validity is resolved in favor of Plaintiff and that the RED GOLD mark is therefore descriptive, summary judgment remains inappropriate because Plaintiff has proffered evidence that the mark has acquired a secondary meaning. "Descriptive marks are presumptively unprotectable, but can acquire a degree of protection if they have acquired secondary meaning, *i.e.*, an acquired public recognition as a mark identifying the source." *RiseandShine*, 41 F.4th at 121; *accord Gruner*, 991 F.2d at 1076. Plaintiff relies on an industry expert, Ms. O'Steen, who analyzed Plaintiff's use of the RED GOLD mark throughout the past twenty years, including its usage and exposure in publications, at prestigious fashion shows, in media coverage, by Plaintiff's celebrity clientele (including Ellen DeGeneres, Will Smith, Geena Davis, Jay Z, and others) and in co-promotions with the late Muhammad Ali.

Defendants argue that this evidence is insufficient for a jury to reasonably find for Plaintiff because Ms. O'Steen is unfamiliar with "level of sales or advertising spend now or at any point in the company's history." Defendants also point to purportedly inconsistent statements where Plaintiff's expert testified that consumers who recognize Plaintiff's brand constitute a "micro-universe." These arguments go to the weight of Plaintiff's evidence and simply confirm a triable issue of fact concerning the strength of the RED GOLD mark. *See*

McCarthy on Trademarks and Unfair Competition § 32:119 (5th ed.) ("[T]he intangible and ephemeral nature of secondary meaning" renders it difficult to resolve "merely on the affidavits in a summary judgment motion.").

### 2.      Similarity of the Marks (Factor 2)

The second *Polaroid* factor is the similarity of the marks.  This inquiry involves looking at "how [the marks] are presented in the marketplace." *The Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 962 (2d Cir. 1996).  "In assessing similarity, courts look to the overall impression created by the logos and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers." *Gruner*, 991 F.2d at 1078; *accord Flushing Bank v. Green Dot Corp.*, 138 F. Supp. 3d 561, 587 (S.D.N.Y. 2015) ("In evaluating similarity, a court looks at how a mark as a whole sounds, looks and feels -- reviewing the size of a mark, design of a logo, the typeface, how a word sounds when spoken.").

Here, Defendants concede that they use the term "red gold," which is identical to Plaintiff's mark.  *See Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 149 (2d Cir. 2003) (reversing district court's denial of preliminary injunction where plaintiff's and defendants' marks "both consisted of the same word, 'virgin'").  The Second Circuit has "observed that using two identical words in sequence to form a mark is 'extremely unusual' and therefore weighs in favor of finding confusing similarity." *Reply All Corp. v. Gimlet Media, LLC*, 843 F. App'x 392, 396 (2d. Cir. 2021) (citing *Car-Freshner Corp. v. Am. Covers, LLC*, 980 F.3d 314, 330 (2d Cir. 2020)).

Defendants argue that their use of the term could not create confusion because they do not use the term as a mark, always use it in conjunction with their house brands and only in relation to products made at least in part from the alloy red gold and in a context that made the

reference clear.  *See RiseandShine*, 41 F.4th at 124-25 ("[T]he word 'Rise' in this context is not distinctive.  Therefore, without more striking visual similarities, the shared use of this ordinary word, used to signify a virtue of the product, is not enough to render the two products 'confusingly similar.'"); *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 46-48 (2d Cir. 2000) ("Warner-Lambert's prominent use of its well-known [DENTYNE] house brand therefore significantly reduces, if not altogether eliminates, the likelihood that consumers will be confused as to the source of the parties' products.").  Plaintiff disputes Defendants' factual assertions with evidence and argument.

These factual disputes and competing considerations create a question as to whether and to what extent Defendants' use of the identical term as Plaintiff's mark is sufficiently similar to create confusion.

### 3.     Proximity of the Products (Factor 3)

The third factor is the proximity of the products and their competitiveness with each other.  "The proximity factor can apply to both the subject matter of the commerce in which the two parties engage and the geographic areas in which they operate."  *Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 826 F.3d 27, 39 (2d Cir. 2016).  Market proximity looks at "whether and to what extent the two products compete with each other," considering "the nature of the products themselves and the structure of the relevant market."  *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 480 (2d Cir. 1996).  Here, it is undisputed that the products at issue are luxury watches, although there is some question as to whether the parties concentrate on different customers within that market.  A reasonable jury could find that the proximity of the products in the relevant market favors a finding of confusion.

### 4. Bridging the Gap (Factor 4)

The fourth factor is the likelihood that the plaintiff will "bridge the gap" by developing a product for sale in the defendant's market. This factor is inapplicable here because the parties' products are already in competitive proximity. As such, there is "no gap to bridge, and this factor is irrelevant to the *Polaroid* analysis." *Star Indus., Inc. v. Bacardi & Co.*, 412 F.3d 373, 387 (2d Cir. 2005) (treating this factor as neutral where both parties used marks on liquor bottle labels); *accord Guthrie*, 826 F.3d at 45.

### 5. Actual Confusion (Factor 5)

The fifth *Polaroid* factor is actual confusion. "[I]t is black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source." *Guthrie*, 826 F.3d at 45 (finding a likelihood of confusion and broadening the scope of the District Court's permanent injunction despite no evidence of actual confusion); *accord Reply All Corp.*, 843 F. App'x at 397. Nevertheless, "[i]nstances of actual confusion resulting from a junior user's use of a mark similar to a senior user's can be powerful evidence supporting a likelihood of confusion." *Guthrie*, 826 F.3d at 44.

Plaintiff asserts that "[w]hile it has proffered witnesses who will testify at trial as to the issue of confusion, a plaintiff need not show actual confusion to prevail." But Plaintiff does not name a single witness who has or will provide evidence of actual confusion. "[I]t is not the role of the Court to search the summary judgment record for evidence supporting a party's motion or opposition thereto." *Knight v. Nassau Cnty.*, No. 17 Civ. 958, 2019 WL 3817392, at *4 (E.D.N.Y. Aug. 14, 2019). As a result, there is no question for a jury to resolve on the issue of actual confusion and no such evidence to weigh in favor of a finding of likelihood of confusion.

*See Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 117 (2d Cir. 2009)

(coexistence of two marks "with no report of a single customer becoming confused is a powerful

indication that there is no confusion." (internal quotation marks omitted)).

### 6. Bad Faith (Factor 6)

The sixth factor is the defendant's bad faith in adopting the imitative term.  This factor,

along with the quality of the products, is not "of high relevance to the issue of likelihood of

confusion."  *Virgin Enters. Ltd.*, 335 F.3d at 151.  Rather, "[a] finding that a party acted in bad

faith can affect the court's choice of remedy or can tip the balance where questions are close."

*Id.*  Nevertheless, "subjective issues such as good faith are singularly inappropriate for

determination on summary judgment."  *Tiffany & Co.*, 971 F.3d at 88 (internal quotation marks

omitted).

Here, Plaintiff asserts that Defendants' bad faith is evidenced by (1) their decision to later

change the product labeling from "red gold" to "pink gold," reflecting the earlier availability of

other descriptive terms and a decision not to use them and (2) Defendants' knowledge of

Plaintiff's mark while they continued to use it for eight years.  Drawing all inferences in favor of

Plaintiff, a reasonable jury could infer that Defendants used the mark in bad faith.

### 7. Quality of the Products (Factor 7)

The seventh factor is the quality of the respective products.  This factor primarily affects

the issue of harm to the senior user's reputation and is less pertinent to the likelihood of

confusion.  *Virgin Enters. Ltd.*, 335 F.3d at 152.  Here, neither party disputes that Defendants'

products -- luxury watches -- are of high quality.  This factor presents no jury question.

### 8.      Buyers' Sophistication (Factor 8)

The eighth factor is the buyers' sophistication.  "Generally, the more sophisticated and careful the average consumer of a product is, the less likely it is that similarities in . . . trademarks will result in confusion concerning the source or sponsorship of the product." *Bristol-Myers Squibb Co.*, 973 F.2d at 1046.  But "price alone is not determinative of the care a consumer will take in making purchases," *Starbucks Corp.*, 588 F.3d at 119, and the "touchstone" is "the general impression that is left with the ordinary consumer," *Sports Auth., Inc.*, 89 F.3d at 965.

Defendants argue that the high price point of the products at issue -- between "several thousand dollars to over $100,000" -- supports a finding that consumers should be viewed as sophisticated and as exercising a high degree of care with respect to their purchases.  But Plaintiff submits evidence from which a reasonable jury could find in its favor.  Specifically, Plaintiff relies on its industry expert, Ms. O'Steen, to argue that prospective purchasers exercise varying degrees of care and a "small and exclusive group of affluent consumers" in the market may view the purchase of a watch as insignificant to them.  Accordingly, viewing the evidence in favor of the non-moving party, a reasonable jury could find that this factor weighs in favor of finding a likelihood of confusion.

### 9.      Overall Likelihood of Confusion

"The evaluation of the *Polaroid* factors is not a mechanical process where the party with the greatest number of factors weighing in its favor wins.  Rather a court should focus on the ultimate question of whether consumers are likely to be confused." *Tiffany & Co.*, 971 F.3d at 85 (internal quotation marks omitted).  Overall, the record evidence -- when considered in the aggregate and construed in favor of Plaintiff -- creates a genuine question of whether

Defendants' use of the term "red gold" was likely to cause confusion with Plaintiff's products sold under the RED GOLD mark. *See id.* at 91. This conclusion primarily rests on questions of fact and the relative weight of three of the *Polaroid* factors -- the strength of the mark and whether, after years' of use, Plaintiff's RED GOLD mark has developed a secondary meaning in the eyes of consumers who may now associate the mark with Plaintiff's products; the similarity of the marks and whether Defendants' use of the identical term "red gold" is likely to confuse consumers; and market proximity about which there seems to be no dispute that both Defendants and Plaintiff use "red gold" to refer to watches, which are Plaintiff's principal product. The Court is mindful that the resolution of factual disputes must be left to the jury, as well as the weighing of their relative importance in the context of a particular case. Affording full credit to Plaintiff's evidence and drawing all inferences in Plaintiff's favor, a jury could reasonably conclude that consumers of luxury watches are likely to be confused by Defendants' use of the term "red gold." *See Tiffany & Co.*, 971 F.3d at 91-92 ("[A]t the summary judgment stage, [even if one] inference . . . seems the better of the possible inferences that can be drawn, we must still draw all inferences in favor of the non-moving party." (quoting *Island Software & Comput. Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 264 (2d Cir. 2005))).

  **C.**  **Fair Use Defense**

  Defendants also move for summary judgment on their fair use defense. "The Lanham Act provides that when a party 'uses the words constituting [a registered] mark in a purely descriptive sense, this use may qualify as permissible fair use.'" *Tiffany & Co.*, 971 F.3d at 92 (quoting *Kelly-Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir. 2013)). A defendant may raise a fair use defense even where the challenged material is likely to cause some confusion. *See KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 121-22 (2004). "To

demonstrate fair use, a defendant must establish that it used the allegedly infringing term '(1) other than as a mark, (2) in a descriptive sense, and (3) in good faith.'" *Tiffany & Co.*, 971 F.3d at 92 (quoting *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 400 (2d Cir. 2009)); *see also* 15 U.S.C. § 1115(b)(4). In other words, to prevail on summary judgment, Defendants would need to show beyond dispute that they satisfy all three of these requirements. Summary judgment is denied because there are questions as to each that require resolution by a jury.

Defendants argue that the Court should extend its fair use ruling to all of Defendants' uses. The Court's June 8, 2020, Opinion and Order on Defendants' motion to dismiss concluded that one IWC watch advertisement constituted fair use where "the term 'red gold' occurs in the product description only, is used in prose and appears inconspicuously below a large product heading." *Solid 21, Inc. v. Richemont N. Am., Inc.*, No. 19 Civ. 1262, 2020 WL 3050970, at *6 (S.D.N.Y. June 8, 2020). For the reasons discussed below, while a reasonable jury could conclude that, in certain instances, Defendants' use of the term "red gold" was fair use, the evidence is not so unequivocal to support a finding in all instances.

### 1.      Use "As a Mark"

A defendant uses a term "as a mark" when it employs it "as a symbol to attract public attention," *Kelly-Brown*, 717 F.3d at 306 (internal quotation marks omitted), or "to identify and distinguish . . . goods [or services] . . . and to indicate [their] source," 15 U.S.C. § 1127. "Whether a defendant has done so may entail an investigation into, *inter alia*, whether the challenged material appeared on the product 'itself, on its packaging, or in any other advertising or promotional materials related to [the] product,' and the degree to which 'defendants were trying to create, through repetition . . . a[n] association between [themselves] and the [mark].'" *Tiffany & Co.*, 971 F.3d at 92 (quoting *Kelly-Brown*, 717 F.3d at 310-11).

18

Plaintiff states that Defendants identified and produced more than 7,000 page of marketing materials in which they used the term "red gold."  The parties dispute what inference should be drawn from these materials.  Defendants, for example, assert that a "very small number of products" used the term; that "red gold" as a descriptive term was "almost always" in in small print; that an "even smaller number of those products" used the term in the product header and in "close proximity" to Defendants' house brands.  Whether these materials show the type and extent of use sufficient to show a "protracted, persistent" attempt to build an association between Defendants and Plaintiff's RED GOLD mark, as Plaintiff asserts, is a question for the jury.  The "use as a mark" factor does not warrant summary judgment for Defendants on the fair use defense.

### 2.        Descriptive Use

"Whether a phrase is descriptive refers to its tendency to describe the goods in question in a broad sense, including not only 'words that describe a characteristic of the goods[] such as size or quality,' but also words or images that more abstractly identify some information about the goods in question." *Tiffany & Co.*, 971 F.3d at 93 (quoting *Cosmetically Sealed Indus. v. Chesebrough-Pond's USA Co.*, 125 F.3d 28, 30 (2d Cir. 1997)).  Descriptive sense is often evident "[w]here a mark incorporates a term that is the only reasonably available means of describing a characteristic of another's goods." *EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.*, 228 F.3d 56, 65 (2d Cir. 2000).  "[W]hether a defendant has used a name descriptively requires 'individualized consideration' of *how* the defendant has used the name." *Tiffany & Co.*, 971 F.3d at 94.

Defendants argue that no triable issue of fact exists on this issue because Defendants used the term "red gold" only to describe products that contained a red gold alloy.  This argument is

19

insufficient to overcome summary judgment.  A triable issue exists around Defendants' allegedly descriptive use of the term "red gold."  As discussed in the context of the validity of Plaintiff's mark *supra*, the parties dispute whether the term "red gold" is descriptive -- i.e., whether it is a term commonly used to describe an alloy.  A related question is whether Defendants actually considered and used the term "red gold" to be descriptive of a particular alloy, since in 2019 they changed all references to "red gold" in the names and descriptions of their products to "pink gold."  In addition, as explained in the Court's June 8, 2020, Opinion and Order, a reasonable jury could conclude that the use of the term "red gold" in the headings of the product listings of Defendants' luxury watches -- the same type of products as Plaintiff's -- in an identical font type and size as the products' brand name could be "understood as an effort to create the appearance of collaborating with Plaintiff, even where the advertisements appear on Defendants' websites displaying their own brand and product lines."  *Solid 21*, 2020 WL 3050970, at *5.  Finally, "red gold" may not be merely descriptive if it has acquired a secondary meaning, which Plaintiff's expert opines has occurred.  The "descriptive use" requirement of fair use cannot be decided here by summary judgment.[1]

### 3.  Good Faith

Good faith is the third requirement for fair use and also cuts against summary judgment on the fair use affirmative defense.  The "good faith" prong of the fair use analysis is essentially identical to the same prong of the Polaroid analysis and "concerns the question of whether the

---

[1]  Plaintiff has pursued trademark infringement claims against Breitling U.S.A., Breitling S.A., and Breitling A.G. (together "Breitling") in a separate action in the District of Connecticut.  *See Solid 21, Inc. v. Breitling U.S.A., Inc.*, 2021 WL 5868173.  There, on a motion for reconsideration, the Court granted the defendants' summary judgment motion on fair use.  *See id.* at *2-6.  Plaintiff's action against Breitling is distinguishable because whether a defendant's use is "fair" is necessarily entirely dependent on that particular defendant's use.  The defendants and their use of the RED GOLD mark in this case and the Connecticut case are not the same.

user of a mark intended to create consumer confusion as to source or sponsorship." *JA Apparel*, 568 F.3d at 401 (quoting *EMI Catalogue*, 228 F.3d at 66-67). For the reasons discussed above, drawing all inferences in favor of Plaintiff, a reasonable jury could infer that Defendants used Plaintiff's mark in bad faith. Accordingly, summary judgment is denied as to Defendants' fair use defense.

### D. Intracompany Sales

Defendants seek summary judgement on intracompany sales made from Europe-based Defendants RISA and Montblanc-Simplo GmbH to their U.S. affiliate, Defendant RNA. Defendants argue that these sales should be excluded from liability because "[i]t is impossible for any confusion to arise from transactions occurring between these affiliated entities." Plaintiff concedes RNA could not be confused about Defendants' use of the term "red gold" implicating Plaintiff's mark or its products. Summary judgment is therefore granted to Defendants as to those affiliate sales.

Plaintiff argues that the relevant likelihood of confusion is from the end consumer, not between affiliated entities, and the products sold to RNA were subsequently sold to end consumers. That may be, but Plaintiff has given up those claims. RNA is the company that sold to the end consumers, and RNA had a tolling agreement with Plaintiff that allowed RNA to continue using the term "red gold" without consequence. *Solid 21*, 2020 WL 3050970, at *4-5.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's dilution claim is dismissed; Defendants' motion for summary judgment is granted as to Defendants' intracompany sales and is otherwise denied; and Plaintiff's motion for summary judgment is denied. Defendants' motion for oral argument is denied as moot.

The Clerk of Court is respectfully directed to close the motion at Dkt. Nos. 134 and 155.

Dated: June 14, 2023
       New York, NY

**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**