UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SOLID 21, INC.,

       Plaintiff,

-against-

RICHEMONT NORTH AMERICA, INC.,
RICHEMONT INTERNATIONAL S.A., and
MONTBLANC-SIMPLO GMBH,

       Defendants.

19-cv-1262 (AS)

OPINION AND ORDER

---

ARUN SUBRAMANIAN, United States District Judge:

  Plaintiff Solid 21, Inc. brought this action against Defendants Richemont North America, Inc., Richemont International S.A., and Montblanc-Simplo GmbH (collectively, "Defendants"), alleging trademark infringement of Plaintiff's RED GOLD mark. This order resolves Plaintiff's motions *in limine* ("MIL") to exclude certain expert testimony by Defendants' proffered experts Dr. Patrick Kennedy and Mr. Mark Keegan. *See* Dkt Nos. 186, 190. For the foregoing reasons, Solid 21's motion *in limine* to exclude the expert testimony of Mr. Mark Keegan is DENIED. Solid 21's motion *in limine* to exclude the expert testimony of Dr. Patrick Kennedy is DENIED in part and GRANTED in part.

## LEGAL STANDARD

  Under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc*, 509 U.S. 579 (1993), the proponent of an expert witness must show: (1) that the "witness . . . is qualified as an expert by knowledge, skill, experience, training, or education," (2) that the expert's "testimony is based upon sufficient facts or data," (3) that the expert's "testimony is the product of reliable principles and methods," and (4) that "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702; *see also In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 539 (S.D.N.Y. 2004) (Rule 702 "incorporates principles established in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, in which the Supreme Court charged trial courts with a gatekeeping role to 'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" (quoting *Daubert*, 509 U.S. at 589)). The proponent of the expert testimony must also show that "the testimony is relevant and will assist the jury." *In re Mirena IUS Levonorgestrel-Related Prods. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 239–40 (S.D.N.Y. 2018), *aff'd*, 982 F.3d 113 (2d Cir. 2020).

  "It is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions, representing a departure from the previously widely followed, and more restrictive, standard of *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923)." *Nimely v. City*

1

*of New York*, 414 F.3d 381, 395 (2d Cir. 2005). Nevertheless, under *Daubert*, "trial judges are charged with ensuring that expert testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" *Zuchowicz v. United States*, 140 F.3d 381, 386 (2d Cir. 1998) (quoting *Daubert*, 509 U.S. at 597). "Thus, while *Daubert* and the Federal Rules of Evidence 'allow district courts to admit a somewhat broader range of scientific testimony than would have been admissible under *Frye*, they leave in place the 'gatekeeper' role of the trial judge in screening such evidence.'" *Id.* (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997)).

## DISCUSSION

### I.

Mark Keegan is proffered as a survey expert by Defendants. According to his report, Mr. Keegan "designed and executed a study of 686 current and prospective luxury watch purchasers." Dkt No. 191-2 at 3. Defendants argue that Mr. Keegan's survey is meant "to gauge the extent to which consumers recognize 'red gold' as a brand in certain of Defendants' advertisements and the extent to which the term 'red gold' contributes to a consumer's purchasing decisions with respect to Defendants' watches." Defs.' Opp'n at 1, Dkt No. 201. Solid 21 moves to exclude Mr. Keegan's testimony and expert report, claiming that he is unqualified and that his survey findings are irrelevant and unreliable. *See* Pl.'s MIL, Dkt No. 190. For the foregoing reasons, Solid 21's motion is denied.

### A.

First, Solid 21 claims that Mr. Keegan's testimony should be excluded because he is unqualified. Solid 21 points to the fact that Mr. Keegan lacks a degree relating to consumer surveys and that "[o]ther courts have concluded that he is unqualified as an expert on multiple occasions." Pl.'s MIL at 3, Dkt No. 190.

"The initial question of whether a witness is qualified to be an 'expert' is important, among other reasons, because an "expert" witness is permitted substantially more leeway than 'lay' witnesses in testifying as to opinions that are not 'rationally based on [his or her] perception.'" *Nimely*, 414 F.3d at 396 n.11 (quoting *United States v. Garcia*, 291 F.3d 127, 139 & n. 8 (2d Cir. 2002)). Nevertheless, the "words 'qualified as an expert by knowledge, skill, experience, training, or education' must be read in light of the liberalizing purpose of" Rule 702. *United States v. Brown*, 776 F.2d 397, 400 (2d Cir. 1985).

Mr. Keegan has sufficient qualifications to satisfy the threshold of admissibility. While Mr. Keegan lacks a degree related to consumer surveys, his resume indicates that he has "[d]esigned and executed over 700 consumer research studies reaching more than 250,000 respondents for corporate and litigation clients over the course of [a] two-decade Career." Dkt No. 191-1 at 3. In addition, Mr. Keegan's expert report states that he has "personally conducted hundreds of consumer surveys" and that his firm is "regularly engaged by clients for non-litigation consulting assignments related to marketing research and strategy." Dkt No. 203-4 at 4. Based on this

experience, the Court concludes that Mr. Keegan's "knowledge of the subject is such that his opinion will likely assist the trier of fact in arriving at the truth." *Johnson & Johnson Vision Care, Inc. v. CIBA Vision Corp.*, No. 4-CV-7369, 2006 WL 2128785, at *5 (S.D.N.Y. July 28, 2006) (citation omitted).

The two cases in which Mr. Keegan's testimony was excluded do not provide a basis for excluding him as an expert here. In *Warner Bros. Ent. v. Glob. Asylum, Inc.*, No. 12-CV-9547, 2013 WL 12114836 (C.D. Cal. Jan. 29, 2013), Mr. Keegan was excluded because the record in that case provided "no indication" of his "training or experience in crafting or analyzing consumer perception surveys." *Id.* at *7, *aff'd sub nom. Warner Bros. Ent. v. Glob. Asylum, Inc.*, 544 F. App'x 683 (9th Cir. 2013). However, the materials proffered by Defendants in this case demonstrate that Mr. Keegan has experience conducting consumer surveys spanning many years, details that appear to have been left out in *Warner Brothers*. Solid 21 also points to *Flushing Bank v. Green Dot Corp.*, 138 F. Supp. 3d 561 (S.D.N.Y. 2015), but that case didn't involve a *Daubert* challenge to Mr. Keegan's testimony at all. Instead, a trial declaration of Mr. Keegan was offered in support of a *Daubert* motion to exclude the testimony of *another expert*. In that context, the District Court noted in a footnote that it found that Mr. Keegan's background did not provide a "reliable" basis for the criticisms that he raised. The court focused on what it viewed as "a large amount of 'cutting and pasting' between a prior report and [the] report [at issue], potentially reflecting off-the-shelf criticism." *Id.* at 582 n.16. It is unclear from the court's footnote in *Flushing Bank* what Mr. Keegan's criticisms of the other expert were, where he got them, and what the exact nature of the consumer study he was challenging was. Suffice it to say that the court in *Flushing Bank* did not suggest that Mr. Keegan could not be qualified to conduct his own study in an appropriate case, and it certainly did not address the survey at issue here. Solid 21 can challenge Mr. Keegan's qualifications at trial, but there is no basis to exclude his testimony altogether on this basis.

**B.**

Solid 21 also argues that Mr. Keegan's testimony regarding his Brand Identification Module should be excluded. To conduct this Brand Identification survey, Mr. Keegan asked respondents to identify all the "brands" they observed when looking at two Richemont print advertisements. *See* Dkt No. 138-3 at 3. "Red gold" was identified as a brand by four respondents (.6% of the sample) for the first advertisement and by one respondent (.1% of the sample) for the second advertisement. *See id.* at 10. Solid 21 argues that this survey is irrelevant because it is not "useful as a genericness survey" and is "not designed to measure any likelihood of confusion." Pl.'s MIL at 3–4, Dkt No. 190. Instead, Solid 21 argues that the survey's "only use" is to provide a basis for Dr. Kennedy's damages report, despite Mr. Keegan not being "proffered as an expert on any element of damages." *Id.* at 4. Defendants respond that Mr. Keegan's testimony is relevant to both the question of apportionment and fair use.

3

"In fulfilling [its] gatekeeping role, the trial court should look to the standards of Rule 401 in analyzing whether proffered expert testimony is relevant, *i.e.*, whether it has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (internal quotation and alteration omitted). Mr. Keegan's opinions are potentially relevant to fair use, and so the Court will not—at this juncture—exclude them entirely.

To prove fair use, Defendants must show that "red gold" is used in their advertisements "(1) other than as a mark, (2) in a descriptive sense, and (3) in good faith." *EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.*, 228 F.3d 56, 64 (2d Cir. 2000). Defendants argue that Mr. Keegan's Brand Identification Module "assessed the extent to which respondents understood Defendants' use of 'red gold' in advertising copy to be brand (i.e., trademark) use." Dkt No. 277 at 2. In other words, Defendants argue that the results of Mr. Keegan's survey show whether consumers understood Defendants' use of "red gold" to be used "in a descriptive sense," measured by the number of consumers who did not identify the use of "red gold" in Defendants' advertisements as referencing a "brand." Through that lens, Mr. Keegan's survey results are relevant, given that consumer understanding may be considered in assessing whether a phrase is used "in a descriptive sense." *See EMI Catalogue P'ship*, 228 F.3d at 64–65 (finding that whether use of the mark "Sing, Sing, Sing" was descriptive depends on "whether the mark as used describes an action the alleged infringer hopes consumers will make of its product."); *see also Disney Enterprises, Inc. v. Sarelli*, 322 F. Supp. 3d 413, 431 (S.D.N.Y. 2018) (finding that the defendant failed to meet the burden of showing that the phrase was descriptive because "a reasonable consumer viewing [the defendant's] advertisements offering . . . would understand the nature of the services being offered only by reference to Plaintiffs' marks.").

Solid 21 does not provide any argument demonstrating that Mr. Keegan's survey result is not relevant to fair use. In its motion *in limine*, Solid 21 argues only that the survey "is clearly not useful as a genericness survey" and is "not designed to measure likelihood of confusion." Pl.'s MIL at 3–4, Dkt No. 190. Solid 21 does not mention the potential relevance to fair use. In its supplemental letter to the Court, Solid 21 argues primarily that Mr. Keegan's findings are unreliable, rather than irrelevant. As to relevance, Solid 21 states that "the Keegan Report does not bear on Defendants' fair use defense because it provides no support for Defendants' good faith adoption of the RED GOLD mark and does not help determine whether Defendants intended to capitalize on Plaintiff's reputation and good will, a necessary element of any fair use defense." Dkt No. 282 at 2. But Defendants never argued that Mr. Keegan's survey is relevant to the "good faith" element of fair use and Solid 21 fails to explain why the survey results are not relevant to the other elements of fair use.

"A court will exclude evidence on a motion *in limine* only if the evidence is '*clearly inadmissible on all potential grounds*.'" *Gucci Am., Inc. v. Guess?, Inc.*, 858 F. Supp. 2d 250, 253 (S.D.N.Y. 2012) (emphasis added) (quoting *United States v. Ozsusamlar*, 428 F. Supp. 2d 161,

4

164 (S.D.N.Y. 2002)). Given this standard, and the potential relevance of Mr. Keegan's survey for fair use purposes, the Court will not exclude Mr. Keegan's survey results from this case. Solid 21 may of course raise the arguments it has made in its briefing at trial to diminish the weight, if any, that the factfinder attributes to Mr. Keegan's testimony.

### C.

Finally, Solid 21 argues that Mr. Keegan's survey findings should be excluded as unreliable. Solid 21 argues generally that Mr. Keegan does not "identify a particular model of survey that he followed." Pl.'s MIL at 4, Dkt No. 190. But Solid 21 only identifies three supposed flaws in Mr. Keegan's survey methodology: the universe of respondents, the size of the stimuli, and a failure to filter low quality responses. None of these potential flaws warrants exclusion.

"To evaluate the validity and reliability of a survey, a court should consider whether: (1) the proper universe was examined and the representative sample was drawn from that universe; (2) the survey's methodology and execution were in accordance with generally accepted standards of objective procedure and statistics in the field of such surveys; (3) the questions were leading or suggestive; (4) the data gathered were accurately reported; and (5) persons conducting the survey were recognized experts." *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 123 (S.D.N.Y. 2022) (quoting *Coty Inc. v. Excell Brands, LLC*, 277 F. Supp. 3d 425, 449–50 (S.D.N.Y. 2017)). In general, "errors in methodology . . . properly go only to the weight of the evidence— subject, of course, to Rule 403's more general prohibition against evidence that is less probative than prejudicial or confusing." *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 228 (2d Cir. 1999), *as amended on reh'g* (Sept. 29, 1999); *accord Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 581 (S.D.N.Y. 2007). Nevertheless, a "survey suffer[ing] from substantial methodological flaws . . . will be excluded under both Rule 403 and Rule 702." *Capri Sun GmbH*, 595 F. Supp. 3d at 123 (quoting *Malletier*, 525 F. Supp. 2d at 581).

First, Solid 21 claims that Mr. Keegan used an improper consumer universe because respondents included people making over $75,000. According to Solid 21, this income level was predicated on Mr. Keegan's "baseless opinion" about who purchases luxury watches and includes individuals who could not "afford the rarefied products that are at issue, with watches commonly costing tens of thousands of dollars." Pl.'s MIL at 5, Dkt No. 190. To be sure, "[a] secondary meaning survey is of 'dubious value' where its universe is not keyed to the relevant market." *See Capri Sun GmbH*, 595 F. Supp. 3d at 123 (quoting *Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*, 652 F. Supp. 1105, 1110–11 (S.D.N.Y. 1987)). "If the wrong universe is surveyed, the results are likely to be irrelevant." *Id.* at 124 (alterations omitted) (quoting *Medisim Ltd. v. BestMed LLC*, 861 F. Supp. 2d 158, 179 (S.D.N.Y. 2012)). But, as Solid 21 acknowledges, Mr. Keegan also required that the respondents "purchased a 'luxury watch' within the past three years and/or intend to purchase one within the next two years." Pl.'s MIL at 5, Dkt No. 190. So the survey respondents were all individuals who identified as past or potential purchasers of the product. Solid 21 does

not offer any explanation of how a higher income threshold would yield different results given this other limitation that Mr. Keegan placed on the survey universe.

Solid 21 offers two remaining criticisms: that respondents may have taken the survey on their cell phone, which would make the text in the images "illegible," and that Mr. Keegan failed to filter out poor quality results. While these potential flaws may impact the weight a factfinder decides to assign to Mr. Keegan's findings, Solid 21 has not demonstrated that they are so substantial as to make Mr. Keegan's survey inadmissible or irrelevant. Indeed, Solid 21 only identifies *two* "poor quality results." Pl.'s MIL at 5, Dkt No. 190.

## II.

Dr. Patrick Kennedy is proffered by Defendants as an expert on the allocation of profits. As relevant background, the Court previously dismissed Solid 21's Lanham Act claims with respect to a particular advertisement—"Exhibit 17"—because the advertisement clearly constituted fair use as a matter of law. *See Solid 21, Inc. v. Richemont N. Am., Inc.*, No. 19-CV-1262, 2020 WL 3050970, at *7 (S.D.N.Y. June 8, 2020). In reaching this conclusion, the Court noted that the term "red gold" "occurs in the product description only, is used in prose," "appears inconspicuously below a large product heading," and otherwise appeared in a way that could only plausibly be understood as descriptive. *Id.* at *6. Dr. Kennedy's damages report claims to identify consumer-facing materials that contain "potentially infringing usage of the term 'red gold'" in "a manner consistent with the distinctions" made in this prior decision. Dkt No. 203-5 at 7. Dr. Kennedy then compiled the sales attributed to the products offered for sale in the "potentially infringing" advertisement. And finally, Dr. Kennedy applied a .6% apportionment factor based on Mr. Keegan's survey findings that only .1% to .6% of respondents identified "Red Gold" as a brand. *Id.* at 26.

Solid 21 moves to exclude portions of Dr. Kennedy's expert opinion because, according to Solid 21, Dr. Kennedy improperly relied on Mr. Keegan's analysis and improperly offers testimony about what constitutes a trademark. For the foregoing reasons, Solid 21's motion is granted in part and denied in part.

## A.

First, Solid 21 argues that Dr. Kennedy should not be permitted to rely on Mr. Keegan's survey findings for his apportionment analysis. Dr. Kennedy characterizes Mr. Keegan's findings as furnishing a basis to determine what sales "are attributable to factors other than Defendants' *use of the term 'red gold.'*" Dkt No. 187-2 at 25 (emphasis added). But Mr. Keegan's analysis was not focused on the impact of the *term* "red gold" in driving consumer preferences. Instead, Mr. Keegan's study measured whether consumers recognized the term "red gold" *as a brand*. Solid 21's motion is therefore granted, due to a fundamental misfit between Mr. Keegan's survey findings (measuring brand awareness) and the use they are put to in Dr. Kennedy's report (measuring consumer preferences). *See Trouble v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 302

6

(S.D.N.Y. 2001) (finding that expert testimony "must not only have a reliable foundation but also be relevant in that it 'fits' the facts" of the case (quoting *Daubert*, 509 U.S. at 591–592)).

Dr. Kennedy's report relies on Mr. Keegan's findings regarding consumer brand awareness. Specifically, Dr. Kennedy's report relies on two paragraphs in Mr. Keegan's report, paragraphs 93 and 95. *See* Dkt No. 187-2 ¶ 52 & n.53–n.55. Both of those paragraphs make clear in *every single sentence* that Mr. Keegan's survey focused on brand awareness, not on what terms in the advertisements—brand or not—drove consumers' purchasing decisions. *See, e.g.*, Dkt No. 138-3 ¶¶ 93, 95 ("'red gold' *as a brand name*," "red gold *as a brand name* in the context of . . ." "zero impact *as a brand*," "do not use red gold *as a brand*," "identified "red gold" *as a brand*," "consumer impact of "red gold" *as a brand*." (emphasis added)). Further, the source of the .1% and .6% figures driving Dr. Kennedy's allocation of profits, was Mr. Keegan's Brand Identification Module, which (according to Mr. Keegan) "was designed to determine the extent to which consumers consider 'red gold' *to be a brand name* when it appears in an advertisement for a Richemont luxury watch." Dkt No. 138-3 ¶ 21 (emphasis added).

Even though Mr. Keegan's findings are measuring brand awareness, Dr. Kennedy uses the findings as a measure of consumer preferences. For example, Dr. Kennedy states that Mr. Keegan's analysis shows that "all of Defendants' sales from the accused products are attributable to factors other than Defendants' use of the term 'red gold." Dkt No. 187-2 ¶ 53. Dr. Kennedy further states that he uses Mr. Keegan's findings as an apportionment factor to measure "the impact of the term 'red gold' on a consumer's purchasing decisions." *Id.* There is therefore a fundamental misfit between Mr. Keegan's findings (*i.e.*, that only .1% to .6% of the market recognized "red gold" as a brand) and Dr. Kennedy's characterization and use of Mr. Keegan's findings (*i.e.*, that assuming liability for infringement, only .1% to .6% of purchases had anything to do with the use of the term "red gold").

Defendants attempt to justify this misfit by arguing that Dr. Kennedy's analysis "assumes that *every* person who identified 'red gold' as a brand in Defendants' ad would purchase the product *exclusively because of* the 'red gold' brand even though there are many other factors that would contribute to a purchasing decision." Dkt No. 277 at 1–2. But Defendants' argument—like Dr. Kennedy's analysis—conflates liability and the apportionment of profits. For liability purposes, consumer brand awareness may be one of many factors relevant in determining whether Defendants' use of "red gold" was infringing. An apportionment analysis asks whether, if liability is assumed, profits nevertheless should be excluded because sales were based on something other than the Defendants' use of the mark. Mr. Keegan's brand awareness findings do not demonstrate what motivated people to purchase Defendants' products and therefore cannot serve as the basis for Dr. Kennedy's apportionment analysis. *Cf. Vital Pharms. v. PhD Mktg., Inc.*, No. 20-CV-06745, 2022 WL 2952495, at *6 (C.D. Cal. July 26, 2022) (excluding a likelihood of confusion survey as a basis for apportioning damages because the "survey did not narrow respondents to actual purchasers" and did not "measure . . . the importance a consumer places on a brand name and logo when deciding to purchase a product" so it was not "evidence showing that any of [the defendant's] sales were not attributable to its unlawful infringement").

7

**B.**

Solid 21 next argues that Dr. Kennedy should be precluded from opining on what constitutes fair use. Specifically, Solid 21 takes issue with Dr. Kennedy's categorization of Defendants' advertisements based on where and how the term "red gold" was used in the advertisement. *See* Dkt No. 187-2 at 8. Solid 21 argues that this is impermissible both because "[a] lay person is perfectly capable of looking at an advertisement and seeing whether 'Red Gold' is used in the title, using capitalization or not, in more or less prominent font, or any other fact that might go into a 'fair use' analysis," and because Dr. Kennedy's analysis constitutes a legal conclusion. Pl.'s MIL at 5–6, Dkt No. 186. With respect to this argument, Solid 21's motion is granted in part and denied in part.

Dr. Kennedy may categorize the advertisements so that his opinion can more easily be presented to the jury. Solid 21 is correct that the jurors are "perfectly capable of looking at an advertisement" themselves and noting differences in how "red gold" is used, but Dr. Kennedy's categorization is not meant to usurp this role of the jury. Instead, grouping the advertisements is meant to synthesize otherwise voluminous material. Streamlining the evidence falls well within the permissible scope of an expert, and Solid 21 can certainly call Dr. Kennedy out where any of his categories miss the mark. *See Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 507 (S.D.N.Y. 2015) ("While a juror may be able to understand each individual source that Matlins cites, Matlins 'synthesizes this material and pulls together common themes in reaching his conclusions.'" (quoting *Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316, 332 (E.D.N.Y. 2013)).

However, as the Court already ruled at the August 30, 2023, hearing, Dr. Kennedy will not be permitted to offer a summary of his impression of the Court's prior rulings. *See, e.g.*, Dkt No. 187-2 at 8 ("According to the Court's Opinion and Order, Defendants' use of 'Red Gold' in both product headings and descriptions plausibly suggests that the use in the headings is independently significant."). Nor will he be permitted to tell the jury that his categorizations are based on "[his] reading of the Court's Opinion and Order." *Id.* at 11; *see also id.* at 25 ("Therefore, I have excluded sales of parts and accessories I believe to be consistent with the Court's Order and Opinion."). Dr. Kennedy is not an expert on fair use and is not permitted to offer legal conclusions about what advertisements are potentially infringing. *See Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992) ("This circuit is in accord with other circuits in requiring exclusion of expert testimony that expresses a legal conclusion.").

While Dr. Kennedy may present his damages findings as to categories of advertisements—rather than presenting a damages calculation with respect to each individual advertisement in this case—he may not describe those categories as an application of this Court's prior rulings.

**CONCLUSION**

Solid 21's motion *in limine* to exclude the expert testimony of Mr. Mark Keegan is DENIED. Solid 21's motion *in limine* to exclude the expert testimony of Dr. Patrick Kennedy is

DENIED in part and GRANTED in part. The Clerk of Court is directed to terminate ECF Nos. 186 and 190.

SO ORDERED.

Dated: September 18, 2023
       New York, New York

                                              ARUN SUBRAMANIAN
                                            United States District Judge